Justice Kennedy
delivered the opinion of the Court.
The National Government and, beyond it, the separate States are bound by the proscriptive mandates of the Eighth Amendment to the Constitution of the United States, and all persons within those respective jurisdictions may invoke its protection. See Amdts. 8 and 14, § 1; Robinson v. California, 370 U. S. 660 (1962). Patrick Kennedy, the petitioner here, seeks to set aside his death sentence under the Eighth Amendment. He was charged by the respondent, the State of Louisiana, with the aggravated rape of his then-8-year-old stepdaughter. After a jury trial petitioner was convicted *413 and sentenced to death under a state statute authorizing capital punishment for the rape of a child under 12 years of age. See La. Stat. Ann. § 14:42 (West 1997 and Supp. 1998). This case presents the question whether the Constitution bars respondent from imposing the death penalty for the rape of a child where the crime did not result, and was not intended to result, in death of the victim. We hold the Eighth Amendment prohibits the death penalty for this offense. The Louisiana statute is unconstitutional.
I
Petitioner’s crime was one that cannot be recounted in these pages in a way sufficient to capture in full the hurt and horror inflicted on his victim or to convey the revulsion society, and the jury that represents it, sought to express by sentencing petitioner to death. At 9:18 a.m. on March 2, 1998, petitioner called 911 to report that his stepdaughter, referred to here as L. H., had been raped. He told the 911 operator that L. H. had been in the garage while he readied his son for school. Upon hearing loud screaming, petitioner said, he ran outside and found L. H. in the side yard. Two neighborhood boys, petitioner told the operator, had dragged L. H. from the garage to the yard, pushed her down, and raped her. Petitioner claimed he saw one of the boys riding away on a blue 10-speed bicycle.
When police arrived at petitioner’s home between 9:20 and 9:30 a.m., they found L. H. on her bed, wearing a T-shirt and wrapped in a bloody blanket. She was bleeding profusely from the vaginal area. Petitioner told police he had carried her from the yard to the bathtub and then to the bed. Consistent with this explanation, police found a thin line of blood drops in the garage on the way to the house and then up the stairs. Once in the bedroom, petitioner had used a basin of water and a cloth to wipe blood from the victim. This later prevented medical personnel from collecting a reliable DNA sample.
*414 L. H. was transported to the Children’s Hospital. An expert in pediatric forensic medicine testified that L. H.’s injuries were the most severe he had seen from a sexual assault in his four years of practice. A laceration to the left wall of the vagina had separated her cervix from the back of her vagina, causing her rectum to protrude into the vaginal structure. Her entire perineum was torn from the posterior fourchette to the anus. The injuries required emergency surgery.
At the scene of the crime, at the hospital, and in the first weeks that followed, both L. H. and petitioner maintained in their accounts to investigators that L. H. had been raped by two neighborhood boys. One of L. H.’s doctors testified at trial that L. H. told all hospital personnel the same version of the rape, although she reportedly told one family member that petitioner raped her. L. H. was interviewed several days after the rape by a psychologist. The interview was videotaped, lasted three hours over two days, and was introduced into evidence at trial. On the tape one can see that L. H. had difficulty discussing the subject of the rape. She spoke haltingly and with long pauses and frequent movement. Early in the interview, L. H. expressed reservations about the questions being asked:
“I’m going to tell the same story. They just want me to change it.... They want me to say my Dad did it... . I don’t want to say it. ... I tell them the same, same story.” Def. Exh. D-7, 01:29:07-:36.
She told the psychologist that she had been playing in the garage when a boy came over and asked her about Girl Scout cookies she was selling; and that the boy “pulled [her by the legs to] the backyard,” id., at 01:47:41-:52, where he placed his hand over her mouth, “pulled down [her] shorts,” Def. Exh. D-8, 00:03:11-:12, and raped her, id., at 00:14:39-:40.
Eight days after the crime, and despite L. H.’s insistence that petitioner was not the offender, petitioner was arrested *415 for the rape. The State’s investigation had drawn the accuracy of petitioner and L. H.’s story into question. Though the defense at trial proffered alternative explanations, the case for the prosecution, credited by the jury, was based upon the following evidence: An inspection of the side yard immediately after the assault was inconsistent with a rape having occurred there, the grass having been found mostly undisturbed but for a small patch of coagulated blood. Petitioner said that one of the perpetrators fled the crime scene on a blue 10-speed bicycle but gave inconsistent descriptions of the bicycle’s features, such as its handlebars. Investigators found a bicycle matching petitioner and L. H.’s description in tall grass behind a nearby apartment, and petitioner identified it as the bicycle one of the perpetrators was riding. Yet its tires were flat, it did not have gears, and it was covered in spider webs. In addition police found blood on the underside of L. H.’s mattress. This convinced them the rape took place in her bedroom, not outside the house.
Police also found that petitioner made four telephone calls on the morning of the rape. Sometime before 6:15 a.m., petitioner called his employer and left a message that he was unavailable to work that day. Petitioner called back between 6:30 and 7:30 a.m. to ask a colleague how to get blood out of a white carpet because his daughter had “ ‘just become a young lady.’” Brief for Respondent 12. At 7:37 a.m., petitioner called B & B Carpet Cleaning and requested urgent assistance in removing bloodstains from a carpet. Petitioner did not call 911 until about an hour and a half later.
About a month after petitioner’s arrest L. H. was removed from the custody of her mother, who had maintained until that point that petitioner was not involved in the rape. On June 22, 1998, L. H. was returned home and told her mother for the first time that petitioner had raped her. And on December 16, 1999, about 21 months after the rape, L. H. recorded her accusation in a videotaped interview with the Child Advocacy Center.
*416 The State charged petitioner with aggravated rape of a child under La. Stat. Ann. § 14:42 (West 1997 and Supp. 1998) and sought the death penalty. At all times relevant to petitioner’s case, the statute provided:
“A. Aggravated rape is a rape committed . . . where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
“(4) When the victim is under the age of twelve years. Lack of knowledge of the victim’s age shall not be a defense.
“D. Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
“(1) However, if the victim was under the age of twelve years, as provided by Paragraph A(4) of this Section:
“(a) And if the district attorney seeks a capital verdict, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury.”
(Since petitioner was convicted and sentenced, the statute has been amended to include oral intercourse within the definition of aggravated rape and to increase the age of the victim from 12 to 18. See La. Stat. Ann. § 14:42 (West Supp. 2007).)
Aggravating circumstances are set forth in La. Code Crim. Proc. Ann., Art. 905.4 (West 1997 Supp.). In pertinent part and at all times relevant to petitioner’s case, the provision stated:
*417 “A. The following shall be considered aggravating circumstances:
“(1) The offender was engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated kidnapping, second degree kidnapping, aggravated burglary, aggravated arson, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, or simple robbery.
“(10) The victim was under the age of twelve years or sixty-five years of age or older.”
The trial began in August 2003. L. H. was then 13 years old. She testified that she “ ‘woke up one morning and Patrick was on top of [her].’” She remembered petitioner bringing her “ ‘[a] cup of orange juice and pills chopped up in it’” after the rape and overhearing him on the telephone saying she had become a “‘young lady.’” 05-1981, pp. 12, 15, 16 (La. 5/22/07), 957 So. 2d 757, 767, 769, 770. L. H. acknowledged that she had accused two neighborhood boys but testified petitioner told her to say this and that it was untrue. Id., at 769.
The jury having found petitioner guilty of aggravated rape, the penalty phase ensued. The State presented the testimony of S. L., who is the cousin and goddaughter of petitioner’s ex-wife. S. L. testified that petitioner sexually abused her three times when she was eight years old and that the last time involved sexual intercourse. Id., at 772. She did not tell anyone until two years later and did not pursue legal action.
The jury unanimously determined that petitioner should be sentenced to death. The Supreme Court of Louisiana affirmed. See id., at 779-789, 793; see also State v. Wilson, 96-1392, 96-2076 (La. 12/13/96), 685 So. 2d 1063 (upholding the constitutionality of the death penalty for child rape). The court rejected petitioner’s reliance on Coker v. Georgia, 433 U. S. 584 (1977), noting that, while Coker bars the use of *418 the death penalty as punishment for the rape of an adult woman, it left open the question which, if any, other nonhomicide crimes can be punished by death consistent with the Eighth Amendment. Because “‘children are a class that need special protection/ ” the state court reasoned, the rape of a child is unique in terms of the harm it inflicts upon the victim and our society. 957 So. 2d, at 781.
The court acknowledged that petitioner would be the first person executed for committing child rape since La. Stat. Ann. § 14:42 was amended in 1995 and that Louisiana is in the minority of jurisdictions that authorize the death penalty for the crime of child rape. But following the approach of Roper v. Simmons, 543 U. S. 551 (2005), and Atkins v. Virginia, 536 U. S. 304 (2002), it found significant not the “numerical counting of which [S]tates .. . stand for or against a particular capital prosecution," but “the direction of change.” 957 So. 2d, at 783 (emphasis deleted). Since 1993, the court explained, four more States—Oklahoma, South Carolina, Montana, and Georgia—had capitalized the crime of child rape, and at least eight States had authorized capital punishment for other nonhomicide crimes. By its count, 14 of the then-38 States permitting capital punishment, plus the Federal Government, allowed the death penalty for nonhomicide crimes and 5 allowed the death penalty for the crime of child rape. See id., at 785-786.
The state court next asked whether “child rapists rank among the worst offenders.” Id., at 788. It noted the severity of the crime; that the execution of child rapists would serve the goals of deterrence and retribution; and that, unlike in Atkins and Roper, there were no characteristics of petitioner that tended to mitigate his moral culpability. 957 So. 2d, at 788-789. It concluded: “[S]hort of first-degree murder, we can think of no other non-homicide crime more deserving [of capital punishment].” Id., at 789.
On this reasoning the Supreme Court of Louisiana rejected petitioner’s argument that the death penalty for the *419 rape of a child under 12 years is disproportionate and upheld the constitutionality of the statute. Chief Justice Calogero dissented. Coker, supra, and Eberheart v. Georgia, 433 U. S. 917 (1977), in his view, “set out a bright-line and easily administered rule” that the Eighth Amendment precludes capital punishment for any offense that does not involve the death of the victim. 957 So. 2d, at 794.
We granted certiorari. 552 U. S. 1087 (2008).
II
The Eighth Amendment, applicable to the States through the Fourteenth Amendment, provides that “[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” The Amendment proscribes “all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive.” Atkins, 536 U. S., at 311, n. 7. The Court explained in Atkins, id., at 311, and Roper, supra, at 560, that the Eighth Amendment’s protection against excessive or cruel and unusual punishments flows from the basic “precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.” Weems v. United States, 217 U. S. 349, 367 (1910). Whether this requirement has been fulfilled is determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791 but by the norms that “currently prevail.” Atkins, supra, at 311. The Amendment “draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society.” Trop v. Dulles, 356 U. S. 86, 101 (1958) (plurality opinion). This is because “[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.” Furman v. Georgia, 408 U. S. 238, 382 (1972) (Burger, C. J., dissenting).
*420 Evolving standards of decency must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule. See Trop, supra, at 100 (plurality opinion). As we shall discuss, punishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution. See Harmelin v. Michigan, 501 U. S. 957, 999 (1991) (Kennedy, J., concurring in part and concurring in judgment); see also Part IV-B, infra. It is the last of these, retribution, that most often can contradict the law’s own ends. This is of particular concern when the Court interprets the meaning of the Eighth Amendment in capital cases. When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint.
For these reasons we have explained that capital punishment must “be limited to those offenders who commit ‘a narrow category of the most serious crimes’ and whose extreme culpability makes them ‘the most deserving of execution.’” Roper, supra, at 568 (quoting Atkins, supra, at 319). Though the death penalty is not invariably unconstitutional, see Gregg v. Georgia, 428 U. S. 153 (1976), the Court insists upon confining the instances in which the punishment can be imposed.
Applying this principle, we held in Roper and Atkins that the execution of juveniles and mentally retarded persons are punishments violative of the Eighth Amendment because the offender had a diminished personal responsibility for the crime. See Roper, supra, at 571-573; Atkins, supra, at 318, 320. The Court further has held that the death penalty can be disproportionate to the crime itself where the crime did not result, or was not intended to result, in death of the victim. In Coker, 433 U. S. 584, for instance, the Court held it would be unconstitutional to execute an offender who had raped an adult woman. See also Eberheart, supra (holding *421 unconstitutional in light of Coker a sentence of death for the kidnaping and rape of an adult woman). And in Enmund v. Florida, 458 U. S. 782 (1982), the Court overturned the capital sentence of a defendant who aided and abetted a robbery during which a murder was committed but did not himself kill, attempt to kill, or intend that a killing would take place. On the other hand, in Tison v. Arizona, 481 U. S. 137 (1987), the Court allowed the defendants’ death sentences to stand where they did not themselves kill the victims but their involvement in the events leading up to the murders was active, recklessly indifferent, and substantial.
In these cases the Court has been guided by “objective indicia of society’s standards, as expressed in legislative enactments and state practice with respect to executions.” Roper, 543 U. S., at 563; see also Coker, supra, at 593-597 (plurality opinion) (finding that both legislatures and juries had firmly rejected the penalty of death for the rape of an adult woman); Enmund, 458 U. S., at 788 (looking to “historical development of the punishment at issue, legislative judgments, international opinion, and the sentencing decisions juries have made”). The inquiry does not end there, however. Consensus is not dispositive. Whether the death penalty is disproportionate to the crime committed depends as well upon the standards elaborated by controlling precedents and by the Court’s own understanding and interpretation of the Eighth Amendment’s text, history, meaning, and purpose. See id., at 797-801; Gregg, supra, at 182-183 (joint opinion of Stewart, Powell, and Stevens, JJ.); Coker, supra, at 597-600 (plurality opinion).
Based both on consensus and our own independent judgment, our holding is that a death sentence for one who raped but did not kill a child, and who did not intend to assist another in killing the child, is unconstitutional under the Eighth and Fourteenth Amendments.
*422 III
A
The existence of objective indicia of consensus against making a crime punishable by death was a relevant concern in Roper, Atkins, Coker, and Enmund, and we follow the approach of those cases here. The history of the death penalty for the crime of rape is an instructive beginning point.
In 1925, 18 States, the District of Columbia, and the Federal Government had statutes that authorized the death penalty for the rape of a child or an adult. See Coker, supra, at 593 (plurality opinion). Between 1930 and 1964, 455 people were executed for those crimes. See 5 Historical Statistics of the United States: Earliest Times to the Present, pp. 5-262 to 5-263 (S. Carter et al. eds. 2006) (Table Ec343357). To our knowledge the last individual executed for the rape of a child was Ronald Wolfe in 1964. See H. Frazier, Death Sentences in Missouri, 1803-2005: A History and Comprehensive Registry of Legal Executions, Pardons, and Commutations 143 (2006).
In 1972, Furman invalidated most of the state statutes authorizing the death penalty for the crime of rape; and in Furman’s aftermath only six States reenacted their capital rape provisions. Three States—Georgia, North Carolina, and Louisiana—did so with respect to all rape offenses. Three States—Florida, Mississippi, and Tennessee—did so with respect only to child rape. See Coker, supra, at 594-595 (plurality opinion). All six statutes were later invalidated under state or federal law. See Coker, supra (striking down Georgia’s capital rape statute); Woodson v. North Carolina, 428 U. S. 280, 287, n. 6, 301-305 (1976) (plurality opinion) (striking down North Carolina’s mandatory death penalty statute); Roberts v. Louisiana, 428 U. S. 325 (1976) (striking down Louisiana’s mandatory death penalty statute); Collins v. State, 550 S. W. 2d 643, 646 (Tenn. 1977) (striking down Tennessee’s mandatory death penalty statute); Buford *423 v. State, 403 So. 2d 943, 951 (Fla. 1981) (holding unconstitutional the imposition of death for child rape); Leatherwood v. State, 548 So. 2d 389, 402-403 (Miss. 1989) (striking down the death penalty for child rape on state-law grounds).
Louisiana reintroduced the death penalty for rape of a child in 1995. See La. Stat. Ann. § 14:42 (West Supp. 1996). Under the current statute, any anal, vaginal, or oral intercourse with a child under the age of 13 constitutes aggravated rape and is punishable by death. See § 14:42 (West Supp. 2007). Mistake of age is not a defense, so the statute imposes strict liability in this regard. Five States have since followed Louisiana’s lead: Georgia, see Ga. Code Ann. 16-6-1 (2007) (enacted 1999); Montana, see Mont. Code Ann. § 45-5-503 (2007) (enacted 1997); Oklahoma, see Okla. Stat., Tit. 10, § 7115(E) (West 2007 Supp.) (enacted 2006); South Carolina, see S. C. Code Ann. § 16-3-655(C)(1) (Supp. 2007) (enacted 2006); and Texas, see Tex. Penal Code Aim. § 12.42(c)(3) (West Supp. 2007) (enacted 2007); see also § 22.021(a). Four of these States’ statutes are more narrow
than Louisiana’s in that only offenders with a previous rape conviction are death eligible. See Mont. Code Ann. § 45-5-503(3)(c); Okla. Stat., Tit. 10, § 7115(E); S. C. Code Ann. § 16-3-655(C)(1); Tex. Penal Code Ann. § 12.42(c)(3). Georgia’s statute makes child rape a capital offense only when aggravating circumstances are present, including but not limited to a prior conviction. See Ga. Code Ann. § 17-10-30 (Supp. 2007).
By contrast, 44 States have not made child rape a capital offense. As for federal law, Congress in the Federal Death Penalty Act of 1994 expanded the number of federal crimes for which the death penalty is a permissible sentence, including certain nonhomicide offenses; but it did not do the same for child rape or abuse. See 108 Stat. 1972 (codified as amended in scattered sections of 18 U. S. C.). Under 18 U. S. C. § 2245, an offender is death eligible only when the sexual abuse or exploitation results in the victim’s death.
*424 Petitioner claims the death penalty for child rape is not authorized in Georgia, pointing to a 1979 decision in which the Supreme Court of Georgia stated that “[statutory rape is not a capital crime in Georgia.” Presnell v. State, 243 Ga. 131, 132-133, 252 S. E. 2d 625, 626. But it appears Presnell was referring to the separate crime of statutory rape, which is not a capital offense in Georgia, see Ga. Code Ann. § 26-2018 (1969); cf. § 16-6-3 (2007). The State’s current capital rape statute, by contrast, is explicit that the rape of “[a] female who is less than ten years of age” is punishable “by death.” §§ 16-6-1(a)(2), (b). Based on a recent statement by the Supreme Court of Georgia it must be assumed that this law is still in force: “Neither the United States Supreme Court, nor this Court, has yet addressed whether the death penalty is unconstitutionally disproportionate for the crime of raping a child.” State v. Velazquez, 283 Ga. 206, 208, 657 S. E. 2d 838, 840 (2008).
Respondent would include Florida among those States that permit the death penalty for child rape. The state statute does authorize, by its terms, the death penalty for “sexual battery upon ... a person less than 12 years of age.” Fla. Stat. § 794.011(2) (2007); see also § 921.141(5) (2007). In 1981, however, the Supreme Court of Florida held the death penalty for child sexual assault to be unconstitutional. See Buford, supra. It acknowledged that Coker addressed only the constitutionality of the death penalty for rape of an adult woman, 403 So. 2d, at 950, but held that “[t]he reasoning of the justices in Coker .. . compels [the conclusion] that a sentence of death is grossly disproportionate and excessive punishment for the crime of sexual assault and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment,” id., at 951. Respondent points out that the state statute has not since been amended. Pursuant to Fla. Stat. § 775.082(2) (2007), however, Florida state courts have understood Buford to bind their sentencing discretion in child rape cases. See, e. g., Gibson v. State, 721 So. 2d 363, *425 367, and n. 2 (Fla. App. 1998) (deeming it irrelevant that “the Florida Legislature never changed the wording of the sexual battery statute”); Cooper v. State, 453 So. 2d 67 (Fla. App. 1984) (“After Buford, death was no longer a possible penalty in Florida for sexual battery”); see also Fla. Stat. § 775.082(2) (“In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court . . . the court having jurisdiction over a person previously sentenced to death for a capital felony . . . shall sentence such person to life imprisonment”).
Definitive resolution of state-law issues is for the States’ own courts, and there may be disagreement over the statistics. It is further true that some States, including States that have addressed the issue in just the last few years, have made child rape a capital offense. The summary recited here, however, does allow us to make certain comparisons with the data cited in the Atkins, Roper, and Enmund cases.
When Atkins was decided in 2002, 30 States, including 12 noncapital jurisdictions, prohibited the death penalty for mentally retarded offenders; 20 permitted it. See 536 U. S., at 313-315. When Roper was decided in 2005, the numbers disclosed a similar division among the States: 30 States prohibited the death penalty for juveniles, 18 of which permitted the death penalty for other offenders; and 20 States authorized it. See 543 U. S., at 564. Both in Atkins and in Roper, we noted that the practice of executing mentally retarded and juvenile offenders was infrequent. Only five States had executed an offender known to have an IQ below 70 between 1989 and 2002, see Atkins, supra, at 316; and only three States had executed a juvenile offender between 1995 and 2005, see Roper, supra, at 564-565.
The statistics in Enmund bear an even greater similarity to the instant case. There eight jurisdictions had authorized imposition of the death penalty solely for participation in a robbery during which an accomplice committed murder, see 458 U. S., at 789, and six defendants between 1954 and 1982 *426 had been sentenced to death for felony murder where the defendant did not personally commit the homicidal assault, id., at 794. These facts, the Court concluded, “weighted] on the side of rejecting capital punishment for the crime.” Id., at 793.
The evidence of a national consensus with respect to the death penalty for child rapists, as with respect to juveniles, mentally retarded offenders, and vicarious felony murderers, shows divided opinion but, on balance, an opinion against it. Thirty-seven jurisdictions—36 States plus the Federal Government—have the death penalty. As mentioned above, only six of those jurisdictions authorize the death penalty for rape of a child. Though our review of national consensus is not confined to tallying the number of States with applicable death penalty legislation, it is of significance that, in 45 jurisdictions, petitioner could not be executed for child rape of any kind. That number surpasses the 30 States in Atkins and Roper and the 42 States in Enmund that prohibited the death penalty under the circumstances those cases considered.*
B
At least one difference between this case and our Eighth Amendment proportionality precedents must be addressed. Respondent and its amici suggest that some States have an “erroneous understanding of this Court’s Eighth Amendment jurisprudence.” Brief for Missouri Governor Matt Blunt et al. as Amici Curiae 10. They submit that the general propositions set out in Coker, contrasting murder and *427 rape, have been interpreted in too expansive a way, leading some state legislatures to conclude that Coker applies to child rape when in fact its reasoning does not, or ought not, apply to that specific crime.
This argument seems logical at first, but in the end it is unsound. In Coker, a four-Member plurality of the Court, plus Justice Brennan and Justice Marshall in concurrence, held that a sentence of death for the rape of a 16-year-old woman, who was a minor under Georgia law, see Ga. Code Ann. § 74-104 (1973), yet was characterized by the Court as an adult, was disproportionate and excessive under the Eighth Amendment. See 433 U. S., at 593-600; see also id., at 600 (Brennan, J., concurring in judgment); ibid. (Marshall, J., concurring in judgment). (The Court did not explain why the 16-year-old victim qualified as an adult, but it may be of some significance that she was married, had a home of her own, and had given birth to a son three weeks prior to the rape. See Brief for Petitioner in Coker v. Georgia, O. T. 1976, No. 75-5444, pp. 14-15.)
The plurality noted that only one State had a valid statute authorizing the death penalty for adult rape and that “in the vast majority of cases, at least 9 out of 10, juries ha[d] not imposed the death sentence.” Coker, 433 U. S., at 597; see also id., at 594 (“Of the 16 States in which rape had been a capital offense, only three provided the death penalty for rape of an adult woman in their revised statutes — Georgia, North Carolina, and Louisiana. In the latter two States, the death penalty was mandatory for those found guilty, and those laws were invalidated by Woodson and Roberts”). This “history and . . . objective evidence of the country’s present judgment concerning the acceptability of death as a penalty for rape of an adult woman,” id., at 593, confirmed the Court’s independent judgment that punishing adult rape by death was not proportional:
“Rape is without doubt deserving of serious punishment; but in terms of moral depravity and of the injury *428 to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life. Although it may be accompanied by another crime, rape by definition does not include the death of . . . another person. The murderer kills; the rapist, if no more than that, does not. . . . We have the abiding conviction that the death penalty, which ‘is unique in its severity and irrevocability,' Gregg v. Georgia, 428 U. S., at 187, is an excessive penalty for the rapist who, as such, does not take human life.” Id., at 598 (footnote omitted).
Confined to this passage, Coker’s analysis of the Eighth Amendment is susceptible of a reading that would prohibit making child rape a capital offense. In context, however, Coker’s holding was narrower than some of its language read in isolation. The Coker plurality framed the question as whether, “with respect to rape of an adult woman,” the death penalty is disproportionate punishment. Id., at 592. And it repeated the phrase “an adult woman” or “an adult female” in discussing the act of rape or the victim of rape eight times in its opinion. See Coker, supra. The distinction between adult and child rape was not merely rhetorical; it was central to the Court’s reasoning. The opinion does not speak to the constitutionality of the death penalty for child rape, an issue not then before the Court. In discussing the legislative background, for example, the Court noted:
“Florida, Mississippi, and Tennessee also authorized the death penalty in some rape cases, but only where the victim was a child and the rapist an adult. The Tennessee statute has since been invalidated because the death sentence was mandatory. The upshot is that Georgia is the sole jurisdiction in the United States at the present time that authorizes a sentence of death when the rape victim is an adult woman, and only two other jurisdictions provide capital punishment when the victim is *429 a child. . . . [This] obviously weighs very heavily on the side of rejecting capital punishment as a suitable penalty for raping an adult woman.” Id., at 595-596 (citation and footnote omitted).
Still, respondent contends, it is possible that state legislatures have understood Coker to state a broad rule that covers the situation of the minor victim as well. We see little evidence of this. Respondent cites no reliable data to indicate that state legislatures have read Coker to bar capital punishment for child rape and, for this reason, have been deterred from passing applicable death penalty legislation. In the absence of evidence from those States where legislation has been proposed but not enacted we refuse to speculate about the motivations and concerns of particular state legislators.
The position of the state courts, furthermore, to which state legislators look for guidance on these matters, indicates that Coker has not blocked the emergence of legislative consensus. The state courts that have confronted the precise question before us have been uniform in concluding that Coker did not address the constitutionality of the death penalty for the crime of child rape. See, e. g., Wilson, 685 So. 2d, at 1066 (upholding the constitutionality of the death penalty for rape of a child and noting that “[t]he plurality [in Coker] took great pains in referring only to the rape of adult women throughout their opinion” (emphasis deleted)); Upshaw v. State, 350 So. 2d 1358, 1360 (Miss. 1977) (“In Coker the Court took great pains to limit its decision to the applicability of the death penalty for the rape of an adult woman____ As we view Coker the Court carefully refrained from deciding whether the death penalty for the rape of a female child under the age of twelve years is grossly disproportionate to the crime”). See also Simpson v. Owens, 207 Ariz. 261, 268, n. 8, 85 P. 3d 478, 485, n. 8 (App. 2004) (addressing the denial of bail for sexual offenses against children and noting that “[although the death penalty was declared in a plurality *430 opinion of the United States Supreme Court to be a disproportionate punishment for the rape of an adult woman . . . the rape of a child remains a capital offense in some states”); People v. Hernandez, 30 Cal. 4th 835, 869, 69 P. 3d 446, 466 (2003) (addressing the death penalty for conspiracy to commit murder and noting that “the constitutionality of laws imposing the death penalty for crimes not necessarily resulting in death is unresolved”).
There is, to be sure, some contrary authority contained in various state-court opinions. But it is either dicta, see State v. Barnum, 921 So. 2d 513, 526 (Fla. 2005) (addressing the retroactivity of Thompson v. State, 695 So. 2d 691 (Fla. 1997)); State v. Coleman, 185 Mont. 299, 327, 605 P. 2d 1000, 1017 (1979) (upholding the defendant’s death sentence for aggravated kidnaping); State v. Gardner, 947 P. 2d 630, 653 (Utah 1997) (addressing the constitutionality of the death penalty for prison assaults); equivocal in its conclusion, see People v. Huddleston, 212 Ill. 2d 107, 141, 816 N. E. 2d 322, 341-342 (2004) (citing law review articles for the proposition that the constitutionality of the death penalty for nonhomicide crimes “is the subject of debate”); or from a decision of a state intermediate court that has been superseded by a more specific statement of the law by the State’s supreme court, compare, e. g., Parker v. State, 216 Ga. App. 649, 650, n. 1, 455 S. E. 2d 360, 361, n. 1 (1995) (characterizing Coker as holding that the death penalty “is no longer permitted for rape where the victim is not killed”), with Velazquez, 283 Ga., at 208, 657 S. E. 2d, at 840 (“[T]he United States Supreme Court . . . has yet [to] addres[s] whether the death penalty is unconstitutionally disproportionate for the crime of raping a child”).
The Supreme Court of Florida’s opinion in Buford could be read to support respondent’s argument. But even there the state court recognized that “[t]he [Supreme] Court has yet to decide whether [Coker’s rationale] holds true for the rape of a child” and made explicit that it was extending the *431 reasoning but not the holding of Coker in striking down the death penalty for child rape. 403 So. 2d, at 950, 951. The same is true of the Supreme Court of California’s opinion in Hernandez, supra, at 867, 69 P. 3d, at 464.
We conclude on the basis of this review that there is no clear indication that state legislatures have misinterpreted Coker to hold that the death penalty for child rape is unconstitutional. The small number of States that have enacted this penalty, then, is relevant to determining whether there is a consensus against capital punishment for this crime.
C
Respondent insists that the six States where child rape is a capital offense, along with the States that have proposed but not yet enacted applicable death penalty legislation, reflect a consistent direction of change in support of the death penalty for child rape. Consistent change might counterbalance an otherwise weak demonstration of consensus. See Atkins, 536 U. S., at 315 (“It is not so much the number of these States that is significant, but the consistency of the direction of change”); Roper, 543 U. S., at 565 (“Impressive in Atkins was the rate of abolition of the death penalty for the mentally retarded”). But whatever the significance of consistent change where it is cited to show emerging support for expanding the scope of the death penalty, no showing of consistent change has been made in this case.
Respondent and its amici identify five States where, in their view, legislation authorizing capital punishment for child rape is pending. See Brief for Missouri Governor Matt Blunt et al. as Amici Curiae 2, 14. It is not our practice, nor is it sound, to find contemporary norms based upon state legislation that has been proposed but not yet enacted. There are compelling reasons not to do so here. Since the briefs were submitted by the parties, legislation in two of the five States has failed. See, e. g., S. 195, 66th Gen. Assembly, 2d Reg. Sess. (Colo. 2008) (rejected by Senate Appro *432 priations Committee on Apr. 11, 2008); S. 2596, 2008 Leg., Reg. Sess. (Miss. 2008) (rejected by House Committee on Mar. 18, 2008). In Tennessee, the House bills were rejected almost a year ago, and the Senate bills appear to have died in committee. See H. R. 601, 105th Gen. Assembly, 1st Reg. Sess. (2007) (taken off Subcommittee calendar on Apr. 4, 2007); H. R. 662, ibid, (failed for lack of second on Mar. 21, 2007); H. R. 1099, ibid, (taken off notice for Judiciary Committee calendar on May 16, 2007); S. 22, ibid, (referred to General Subcommittee of Senate Finance, Ways, and Means Committee on June 11, 2007); S. 157, ibid, (referred to Senate Judiciary Committee on Feb. 7, 2007; action deferred until Jan. 2008); S. 841, ibid, (referred to General Subcommittee of Senate Judiciary Committee on Mar. 27, 2007). In Alabama, the recent legislation is similar to a bill that failed in 2007. Compare H. R. 456,2008 Leg., Reg. Sess. (2008), with H. R. 335, 2007 Leg., Reg. Sess. (2007). And in Missouri, the 2008 legislative session has ended, tabling the pending legislation. See Mo. Const., Art. III, § 20(a).
Aside from pending legislation, it is true that in the last 13 years there has been change toward making child rape a capital offense. This is evidenced by six new death penalty statutes, three enacted in the last two years. But this showing is not as significant as the data in Atkins, where 18 States between 1986 and 2001 had enacted legislation prohibiting the execution of mentally retarded persons. See Atkins, supra, at 313-315. Respondent argues the instant case is like Roper because, there, only five States had shifted their positions between 1989 and 2005, one less State than here. See Roper, supra, at 565. But in Roper, we emphasized that, though the pace of abolition was not as great as in Atkins, it was counterbalanced by the total number of States that had recognized the impropriety of executing juvenile offenders. See 543 U. S., at 566-567. When we decided Stanford v. Kentucky, 492 U. S. 361 (1989), 12 death *433 penalty States already prohibited the execution of any juvenile under 18, and 15 prohibited the execution of any juvenile under 17. See Roper, supra, at 566-567 (“If anything, this shows that the impropriety of executing juveniles between 16 and 18 years of age gained wide recognition earlier”). Here, the total number of States to have made child rape a capital offense after Furman is six. This is not an indication of a trend or change in direction comparable to the one supported by data in Roper. The evidence here bears a closer resemblance to the evidence of state activity in Enmund, where we found a national consensus against the death penalty for vicarious felony murder despite eight jurisdictions having authorized the practice. See 458 U. S., at 789, 792.
D
There are measures of consensus other than legislation. Statistics about the number of executions may inform the consideration whether capital punishment for the crime of child rape is regarded as unacceptable in our society. See, e. g., id., at 794-795; Roper, supra, at 564-565; Atkins, supra, at 316; cf. Coker, 433 U. S., at 596-597 (plurality opinion). These statistics confirm our determination from our review of state statutes that there is a social consensus against the death penalty for the crime of child rape.
Nine States — Florida, Georgia, Louisiana, Mississippi, Montana, Oklahoma, South Carolina, Tennessee, and Texas— have permitted capital punishment for adult or child rape for some length of time between the Court’s 1972 decision in Furman and today. See supra, at 422-423; Coker, supra, at 595 (plurality opinion). Yet no individual has been executed for the rape of an adult or child since 1964, and no execution for any other nonhomicide offense has been conducted since 1963. See Historical Statistics of the United States, at 5-262 to 5-263 (Table Ec343-357). Cf. Thompson v. Oklahoma, 487 U. S. 815, 852-853 (1988) (O’Connor, J., concurring *434 in judgment) (that “four decades have gone by since the last execution of a defendant who was younger than 16 at the time of the offense . . . supports] the inference of a national consensus opposing the death penalty for 15-year-olds”).
Louisiana is the only State since 1964 that has sentenced an individual to death for the crime of child rape; and petitioner and Richard Davis, who was convicted and sentenced to death for the aggravated rape of a 5-year-old child by a Louisiana jury in December 2007, see State v. Davis, Case No. 262,971 (1st Jud. Dist., Caddo Parish, La.) (cited in Brief for Respondent 42, and n. 38), are the only two individuals now on death row in the United States for a nonhomicide offense.
After reviewing the authorities informed by contemporary norms, including the history of the death penalty for this and other nonhomicide crimes, current state statutes and new enactments, and the number of executions since 1964, we conclude there is a national consensus against capital punishment for the crime of child rape.
IV
A
As we have said in other Eighth Amendment cases, objective evidence of contemporary values as it relates to punishment for child rape is entitled to great weight, but it does not end our inquiry. “[T]he Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.” Coker, supra, at 597 (plurality opinion); see also Roper, supra, at 563; Enmund, supra, at 797 (“[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty”). We turn, then, to the resolution of the question before us, which is informed by our precedents and our own understanding of the Constitution and the rights it secures.
*435 It must be acknowledged that there are moral grounds to question a rule barring capital punishment for a crime against an individual that did not result in death. These facts illustrate the point. Here the victim’s fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood. For this reason, we should be most reluctant to rely upon the language of the plurality in Coker, which posited that, for the victim of rape, “life may not be nearly so happy as it was,” but it is not beyond repair. 433 U. S., at 598. Rape has a permanent psychological, emotional, and sometimes physical impact on the child. See C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2-24, 111-112 (1990); Finkelhor & Browne, Assessing the Long-Term Impact of Child Sexual Abuse: A Review and Conceptualization, in Handbook on Sexual Abuse of Children 55-60 (L. Walker ed. 1988). We cannot dismiss the years of long anguish that must be endured by the victim of child rape.
It does not follow, though, that capital punishment is a proportionate penalty for the crime. The constitutional prohibition against excessive or cruel and unusual punishments mandates that the State’s power to punish “be exercised within the limits of civilized standards.” Troy, 356 U. S., at 99, 100 (plurality opinion). Evolving standards of decency that mark the progress of a maturing society counsel us to be most hesitant before interpreting the Eighth Amendment to allow the extension of the death penalty, a hesitation that has special force where no life was taken in the commission of the crime. It is an established principle that decency, in its essence, presumes respect for the individual and thus moderation or restraint in the application of capital punishment. See id., at 100.
*436 To date the Court has sought to define and implement this principle, for the most part, in cases involving capital murder. One approach has been to insist upon general rules that ensure consistency in determining who receives a death sentence. See California v. Brown, 479 U. S. 538, 541 (1987) (“[D]eath penalty statutes [must] be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion” (citing Gregg, 428 U. S. 153; Furman, 408 U. S. 238)); Godfrey v. Georgia, 446 U. S. 420, 428 (1980) (plurality opinion) (requiring a State to give narrow and precise definition to the aggravating factors that warrant its imposition). At the same time the Court has insisted, to ensure restraint and moderation in use of capital punishment, on judging the “character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.” Woodson, 428 U. S., at 304 (plurality opinion); Lockett v. Ohio, 438 U. S. 586, 604-605 (1978) (plurality opinion).
The tension between general rules and case-specific circumstances has produced results not altogether satisfactory. See Tuilaepa v. California, 512 U. S. 967, 973 (1994) (“The objectives of these two inquiries can be in some tension, at least when the inquiries occur at the same time”); Walton v. Arizona, 497 U. S. 639, 664-665 (1990) (Scalia, J., concurring in part and concurring in judgment) (“The latter requirement quite obviously destroys whatever rationality and predictability the former requirement was designed to achieve”). This has led some Members of the Court to say we should cease efforts to resolve the tension and simply allow legislatures, prosecutors, courts, and juries greater latitude. See id., at 667-673 (advocating that the Court adhere to the Furman line of cases and abandon the Woodson-Lockett line of cases). For others the failure to limit these same imprecisions by stricter enforcement of narrowing *437 rules has raised doubts concerning the constitutionality of capital punishment itself. See Baze v. Rees, 553 U. S. 35, 82-86 (2008) (Stevens, J., concurring in judgment); Furman, supra, at 310-314 (White, J., concurring); Callins v. Collins, 510 U. S. 1141, 1144-1145 (1994) (Blackmun, J., dissenting from denial of certiorari).
Our response to this case law, which is still in search of a unifying principle, has been to insist upon confining the instances in which capital punishment may be imposed. See Gregg, supra, at 187, 184 (joint opinion of Stewart, Powell, and Stevens, JJ.) (because “death as a punishment is unique in its severity and irrevocability,” capital punishment must be reserved for those crimes that are “so grievous an affront to humanity that the only adequate response may be the penalty of death” (citing in part Furman, 408 U. S., at 286-291 (Brennan, J., concurring); id., at 306 (Stewart, J., concurring))); see also Roper, 543 U. S., at 569 (the Eighth Amendment requires that “the death penalty is reserved for a narrow category of crimes and offenders”).
Our concern here is limited to crimes against individual persons. We do not address, for example, crimes defining and punishing treason, espionage, terrorism, and drug kingpin activity, which are offenses against the State. As it relates to crimes against individuals, though, the death penalty should not be expanded to instances where the victim’s life was not taken. We said in Coker of adult rape:
“We do not discount the seriousness of rape as a crime. It is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim .... Short of homicide, it is the ‘ultimate violation of self.’ . . . [But] [t]he murderer kills; the rapist, if no more than that, does not. . . . We have the abiding conviction that the death penalty, which ‘is unique in its severity and irrevo *438 cability/ is an excessive penalty for the rapist who, as such, does not take human life.” 433 U. S., at 597-598 (plurality opinion) (citation omitted).
The same distinction between homicide and other serious violent offenses against the individual informed the Court’s analysis in Enmund, 458 U. S. 782, where the Court held that the death penalty for the crime of vicarious felony murder is disproportionate to the offense. The Court repeated there the fundamental, moral distinction between a “murderer” and a “robber,” noting that while “robbery is a serious crime deserving serious punishment,” it is not like death in its “severity and irrevocability.” Id., at 797 (internal quotation marks omitted).
Consistent with evolving standards of decency and the teachings of our precedents we conclude that, in determining whether the death penalty is excessive, there is a distinction between intentional first-degree murder on the one hand and nonhomicide crimes against individual persons, even including child rape, on the other. The latter crimes may be devastating in their harm, as here, but “in terms of moral depravity and of the injury to the person and to the public,” Coker, 433 U. S., at 598 (plurality opinion), they cannot be compared to murder in their “severity and irrevocability.” Ibid.
In reaching our conclusion we find significant the number of executions that would be allowed under respondent’s approach. The crime of child rape, considering its reported incidents, occurs more often than first-degree murder. Approximately 5,702 incidents of vaginal, anal, or oral rape of a child under the age of 12 were reported nationwide in 2005; this is almost twice the total incidents of intentional murder for victims of all ages (3,405) reported during the same period. See Inter-University Consortium for Political and Social Research, National Incident-Based Reporting System, 2005, Study No. 4720, online at http://www.icpsr.umich.edu (as visited June 12, 2008, and available in Clerk of Court’s *439 case file). Although we have no reliable statistics on convictions for child rape, we can surmise that, each year, there are hundreds, or more, of these convictions just in jurisdictions that permit capital punishment. Cf. Brief for Louisiana Association of Criminal Defense Lawyers et al. as Amici Curiae 1-2, and n. 2 (noting that there are now at least 70 capital rape indictments pending in Louisiana and estimating the actual number to be over 100). As a result of existing rules, see generally Godfrey, 446 U. S., at 428-433 (plurality opinion), only 2.2% of convicted first-degree murderers are sentenced to death, see Blume, Eisenberg, & Wells, Explaining Death Row’s Population and Racial Composition, 1 J. of Empirical Legal Studies 165, 171 (2004). But under respondent’s approach, the 36 States that permit the death penalty could sentence to death all persons convicted of raping a child less than 12 years of age. This could not be reconciled with our evolving standards of decency and the necessity to constrain the use of the death penalty.
It might be said that narrowing aggravators could be used in this context, as with murder offenses, to ensure the death penalty’s restrained application. We find it difficult to identify standards that would guide the decisionmaker so the penalty is reserved for the most severe cases of child rape and yet not imposed in an arbitrary way. Even were we to forbid, say, the execution of first-time child rapists, see supra, at 422-423, or require as an aggravating factor a finding that the perpetrator’s instant rape offense involved multiple victims, the jury still must balance, in its discretion, those aggravating factors against mitigating circumstances. In this context, which involves a crime that in many cases will overwhelm a decent person’s judgment, we have no confidence that the imposition of the death penalty would not be so arbitrary as to be “freakis[h],” Furman, supra, at 310 (Stewart, J., concurring). We cannot sanction this result when the harm to the victim, though grave, cannot be quantified in the same way as death of the victim.
*440 It is not a solution simply to apply to this context the aggravating factors developed for capital murder. The Court has said that a State may carry out its obligation to ensure individualized sentencing in capital murder cases by adopting sentencing processes that rely upon the jury to exercise wide discretion so long as there are narrowing factors that have some “ ‘common-sense core of meaning ... that criminal juries should be capable of understanding.’” Tuilaepa, 512 U. S., at 975 (quoting Jurek v. Texas, 428 U. S. 262,279 (1976) (White, J., concurring in judgment)). The Court, accordingly, has upheld the constitutionality of aggravating factors ranging from whether the defendant was a “‘cold-blooded, pitiless slayer,’ ” Arave v. Creech, 507 U. S. 463, 471-474 (1993), to whether the “‘perpetrator inflict[ed] mental anguish or physical abuse before the victim’s death,’” Walton, 497 U. S., at 654, to whether the defendant “ ‘would commit criminal acts of violence that would constitute a continuing threat to society,’” Jurek, supra, at 269-270, 274-276 (joint opinion of Stewart, Powell, and Stevens, JJ.). All of these standards have the potential to result in some inconsistency of application.
As noted above, the resulting imprecision and the tension between evaluating the individual circumstances and consistency of treatment have been tolerated where the victim dies. It should not be introduced into our justice system, though, where death has not occurred.
Our concerns are all the more pronounced where, as here, the death penalty for this crime has been most infrequent. See Part III-D, supra. We have developed a foundational jurisprudence in the case of capital murder to guide the States and juries in imposing the death penalty. Starting with Gregg, 428 U. S. 153, we have spent more than 32 years articulating limiting factors that channel the jury’s discretion to avoid the death penalty’s arbitrary imposition in the case of capital murder. Though that practice remains sound, beginning the same process for crimes for which no one has *441 been executed in more than 40 years would require experimentation in an area where a failed experiment would result in the execution of individuals undeserving of the death penalty. Evolving standards of decency are difficult to reconcile with a regime that seeks to expand the death penalty to an area where standards to confine its use are indefinite and obscure.
B
Our decision is consistent with the justifications offered for the death penalty. Gregg instructs that capital punishment is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes. See id., at 173, 183, 187 (joint opinion of Stewart, Powell, and Stevens, JJ.); see also Coker, 433 U. S., at 592 (plurality opinion) (“A punishment might fail the test on either ground”).
As in Coker, here it cannot be said with any certainty that the death penalty for child rape serves no deterrent or retributive function. See id., at 593, n. 4 (concluding that the death penalty for rape might serve “legitimate ends of punishment” but nevertheless is disproportionate to the crime). Cf. Gregg, 428 U. S., at 185-186 (joint opinion of Stewart, Powell, and Stevens, JJ.) (“[T]here is no convincing empirical evidence either supporting or refuting th[e] view [that the death penalty serves as a significantly greater deterrent than lesser penalties]. We may nevertheless assume safely that there are murderers ... for whom ... the death penalty undoubtedly is a significant deterrent”); id., at 186 (the value of capital punishment, and its contribution to acceptable penological goals, typically is a “complex factual issue the resolution of which properly rests with the legislatures”). This argument does not overcome other objections, however. The incongruity between the crime of child rape and the harshness of the death penalty poses risks of overpunish *442 ment and counsels against a constitutional ruling that the death penalty can be expanded to include this offense.
The goal of retribution, which reflects society’s and the victim’s interests in seeing that the offender is repaid for the hurt he caused, see Atkins, 536 U. S., at 319; Furman, supra, at 308 (Stewart, J., concurring), does not justify the harshness of the death penalty here. In measuring retribution, as well as other objectives of criminal law, it is appropriate to distinguish between a particularly depraved murder that merits death as a form of retribution and the crime of child rape. See Part IV-A, supra; Coker, supra, at 597-598 (plurality opinion).
There is an additional reason for our conclusion that imposing the death penalty for child rape would not further retributive purposes. In considering whether retribution is served, among other factors we have looked to whether capital punishment “has the potential... to allow the community as a whole, including the surviving family and friends of the victim, to affirm its own judgment that the culpability of the prisoner is so serious that the ultimate penalty must be sought and imposed.” Panetti v. Quarterman, 551 U. S. 930, 958 (2007). In considering the death penalty for non-homicide offenses this inquiry necessarily also must include the question whether the death penalty balances the wrong to the victim. Cf. Roper, 543 U. S., at 571.
It is not at all evident that the child rape victim’s hurt is lessened when the law permits the death of the perpetrator. Capital cases require a long-term commitment by those who testify for the prosecution, especially when guilt and sentencing determinations are in multiple proceedings. In cases like this the key testimony is not just from the family but from the victim herself. During formative years of her adolescence, made all the more daunting for having to come to terms with the brutality of her experience, L. H. was required to discuss the case at length with law enforcement personnel. In a public trial she was required to recount *443 once more all the details of the crime to a jury as the State pursued the death of her stepfather. Cf. G. Goodman et al., Testifying in Criminal Court: Emotional Effects on Child Sexual Assault Victims 50, 62, 72 (1992); Brief for National Association of Social Workers et al. as Amici Curiae 17-21. And in the end the State made L. H. a central figure in its decision to seek the death penalty, telling the jury in closing statements: “[L. H.] is asking you, asking you to set up a time and place when he dies.” Tr. 121 (Aug. 26, 2003).
Society’s desire to inflict the death penalty for child rape by enlisting the child victim to assist it over the course of years in asking for capital punishment forces a moral choice on the child, who is not of mature age to make that choice. The way the death penalty here involves the child victim in its enforcement can compromise a decent legal system; and this is but a subset of fundamental difficulties capital punishment can cause in the administration and enforcement of laws proscribing child rape.
There are, moreover, serious systemic concerns in prosecuting the crime of child rape that are relevant to the constitutionality of making it a capital offense. The problem of unreliable, induced, and even imagined child testimony means there is a “special risk of wrongful execution” in some child rape cases. Atkins, supra, at 321. See also Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 5-17. This undermines, at least to some degree, the meaningful contribution of the death penalty to legitimate goals of punishment. Studies conclude that children are highly susceptible to suggestive questioning techniques like repetition, guided imagery, and selective reinforcement. See Ceci & Friedman, The Suggestibility of Children: Scientific Research and Legal Implications, 86 Cornell L. Rev. 33, 47 (2000) (there is “strong evidence that children, especially young children, are suggestible to a significant degree — even on abuse-related questions”); Gross, Jacoby, Matheson, Montgomery, & Patil, Exonerations in the *444 United States 1989 Through 2003, 95 J. Grim. L. & C. 523, 539 (2005) (discussing allegations of abuse at the Little Rascals Day Care Center); see also Quas, Davis, Goodman, & Myers, Repeated Questions, Deception, and Children’s True and False Reports of Body Touch, 12 Child Maltreatment 60, 61-66 (2007) (finding that 4- to 7-year-olds “were able to maintain [a] lie about body touch fairly effectively when asked repeated, direct questions during a mock forensic interview”).
Similar criticisms pertain to other cases involving child witnesses; but child rape cases present heightened concerns because the central narrative and account of the crime often comes from the child herself. She and the accused are, in most instances, the only ones present when the crime was committed. See Pennsylvania v. Ritchie, 480 U. S. 39, 60 (1987). Cf. Goodman, supra, at 118. And the question in a capital case is not just the fact of the crime, including, say, proof of rape as distinct from abuse short of rape, but details bearing upon brutality in its commission. These matters are subject to fabrication or exaggeration, or both. See Ceci & Friedman, supra; Quas, supra. Although capital punishment does bring retribution, and the legislature here has chosen to use it for this end, its judgment must be weighed, in deciding the constitutional question, against the special risks of unreliable testimony with respect to this crime.
With respect to deterrence, if the death penalty adds to the risk of nonreporting, that, too, diminishes the penalty’s objectives. Underreporting is a common problem with respect to child sexual abuse. See Hanson, Resnick, Saunders, Kilpatrick, & Best, Factors Related to the Reporting of Childhood Rape, 23 Child Abuse & Neglect 559, 564 (1999) (finding that about 88% of female rape victims under the age of 18 did not disclose their abuse to authorities); Smith et al., Delay in Disclosure of Childhood Rape: Results From a National Survey, 24 Child Abuse & Neglect 273, 278-279 (2000) *445 (finding that 72% of women raped as children disclosed their abuse to someone, but that only 12% of the victims reported the rape to authorities). Although we know little about what differentiates those who report from those who do not report, see Hanson, supra, at 561, one of the most commonly cited reasons for nondisclosure is fear of negative consequences for the perpetrator, a concern that has special force where the abuser is a family member, see Goodman-Brown, Edelstein, Goodman, Jones, & Gordon, Why Children Tell: A Model of Children’s Disclosure of Sexual Abuse, 27 Child Abuse & Neglect 525, 527-528 (2003); Smith, supra, at 283-284 (finding that, where there was a relationship between perpetrator and victim, the victim was likely to keep the abuse a secret for a longer period of time, perhaps because of a “greater sense of loyalty or emotional bond”); Hanson, supra, at 565-566, and Table 3 (finding that a “significantly greater proportion of reported than nonreported cases involved a stranger”); see also Ritchie, supra, at 60. The experience of the amici who work with child victims indicates that, when the punishment is death, both the victim and the victim’s family members may be more likely to shield the perpetrator from discovery, thus increasing underreporting. See Brief for National Association of Social Workers et al. as Amici Curiae 11-13. As a result, punishment by death may not result in more deterrence or more effective enforcement.
In addition, by in effect making the punishment for child rape and murder equivalent, a State that punishes child rape by death may remove a strong incentive for the rapist not to kill the victim. Assuming the offender behaves in a rational way, as one must to justify the penalty on grounds of deterrence, the penalty in some respects gives less protection, not more, to the victim, who is often the sole witness to the crime. See Rayburn, Better Dead Than R(ap)ed?: The Patriarchal Rhetoric Driving Capital Rape Statutes, 78 St. John’s L. Rev. 1119, 1159-1160 (2004). It might be ar *446 gued that, even if the death penalty results in a marginal increase in the incentive to kill, this is counterbalanced by a marginally increased deterrent to commit the crime at all. Whatever balance the legislature strikes, however, uncertainty on the point makes the argument for the penalty less compelling than for homicide crimes.
Each of these propositions, standing alone, might not establish the unconstitutionality of the death penalty for the crime of child rape. Taken in sum, however, they demonstrate the serious negative consequences of making child rape a capital offense. These considerations lead us to conclude, in our independent judgment, that the death penalty is not a proportional punishment for the rape of a child.
V
Our determination that there is a consensus against the death penalty for child rape raises the question whether the Court’s own institutional position and its holding will have the effect of blocking farther or later consensus in favor of the penalty from developing. The Court, it will be argued, by the act of addressing the constitutionality of the death penalty, intrudes upon the consensus-making process. By imposing a negative restraint, the argument runs, the Court makes it more difficult for consensus to change or emerge. The Court, according to the criticism, itself becomes enmeshed in the process, part judge and part the maker of that which it judges.
These concerns overlook the meaning and full substance of the established proposition that the Eighth Amendment is defined by “the evolving standards of decency that mark the progress of a maturing society.” Trop, 356 U. S., at 101 (plurality opinion). Confirmed by repeated, consistent rulings of this Court, this principle requires that use of the death penalty be restrained. The rule of evolving standards of decency with specific marks on the way to full progress and mature judgment means that resort to the penalty must be *447 reserved for the worst of crimes and limited in its instances of application. In most cases justice is not better served by terminating the life of the perpetrator rather than confining him and preserving the. possibility that he and the system will find ways to allow him to understand the enormity of his offense. Difficulties in administering the penalty to ensure against its arbitrary and capricious application require adherence to a rule reserving its use, at this stage of evolving standards and in cases of crimes against individuals, for crimes that take the life of the victim.
The judgment of the Supreme Court of Louisiana upholding the capital sentence is reversed. This case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

When issued and announced on June 25,2008, the Court’s decision neither noted nor discussed the military penalty for rape under the Uniform Code of Military Justice. See 10 U. S. C. §§ 856 (2000 ed.), 920 (2000 ed. and Supp. V); Manual for Courts-Martial, United States, Part IV, Art. 120, ¶ 45.f(1), p. IV-78 (2008). In a petition for rehearing respondent argues that the military penalty bears on our consideration of the question in this case. For the reasons set forth in the statement respecting the denial of rehearing, post, p. 946, we find that the military penalty does not affect our reasoning or conclusions.