CORRIGAN, J.
(dissenting). I respectfully dissent. Circuit Judge Timothy M. Kenny more than adequately *330 justified the 30-year minimum sentences he imposed for defendant’s repeated sexual exploitation of his 10-year-old victim. Indeed, the judge was statutorily authorized to impose a life sentence for defendant’s crimes.[1] Judge Kenny fully complied with his duty under MCL 769.34(3) to state his reasons for “that departure” imposed. The statute does not require a trial judge to chart the sentence imposed for a particular crime by locating it on an elusive spectrum of hypothetical offenses as the majority today mandates. In effect, the majority enacts a new, corollary sentencing regime by extending the sentencing guidelines to apply to departure sentences. In doing so, the majority’s approach directly contradicts People v Babcock, 469 Mich 247; 666 NW2d 231 (2003), and People v Fields, 448 Mich 58; 528 NW2d 176 (1995). Babcock applied the Fields Court’s definition of “substantial and compelling reasons” to that phrase as it appears in MCL 769.34. Babcock, 469 Mich at 257. The very purpose of requiring a trial judge to articulate such reasons was to allow for exceptions to statutorily defined sentences while restricting individual judges’ abilities to depart. Fields, 448 Mich at 68-69. Thus, legislatively imposed restrictions on departures are inherent in the definition of “substantial and compelling reasons” and provide the safety valve necessary for an appellate court to gauge whether a trial judge abused his sentencing power. The majority wrongly concludes that a new, judicially imposed regime is necessary for meaningful appellate review.
Although the majority’s approach may provide helpful guidance to trial judges in some cases, I respectfully contend that it is not in our power to impose new, *331 mandatory sentencing requirements that the Legislature has not chosen to adopt for departures. The legislative scheme requires appellate courts to review the record to determine whether the facts support the departure. It does not require courts to posit a continuum of hypothetical similar crimes and locate the sentencing offense on that continuum. Moreover, I fear that complying with the majority’s proposed requirements will be essentially impossible in many cases and appellate review will not be aided. I would affirm defendant’s sentences instead of imposing a new layer of unjustified burdens on the trial bench.
Significantly, I have no qualms with many of the majority’s general statements. I agree that the trial court “bears the burden of articulating the rationale for . .. departure,” that the court “must articulate one or more substantial and compelling reasons that justify the departure it made,” and that its articulation “must be sufficient to allow adequate appellate review.” Ante at 318. I also agree that, to be proportionate, a minimum sentence that falls outside the guidelines range “must be more appropriate to the offense and the offender than a sentence within the guidelines would have been.” Ante at 318. Further, it may be “appropriate to justify the proportionality of a departure sentence by . .. anchoring it in the sentencing guidelines.” Ante at 318 (emphasis added).[2] But despite its permissive lan *332 guage,[3] the majority effectively mandates its new regime. As is clear from this case, a departure sentence— indeed, a sentence that is not even the highest possible for the offense — for a crime that we unanimously agree is “heinous,” see ante at 310, is being vacated because the trial court did not comply with the majority’s new requirements. Accordingly, I dissent both because I believe that Judge Kenny met the requirement of articulation in this case and because I think that the majority poses an overly burdensome and often impossible task on sentencing courts that is outside the scheme for departures that our Legislature adopted.
The majority acknowledges that, as a reviewing court, we are bound to give significant deference to a trial court’s sentencing decisions. Ante at 300. Most significantly, we review for an abuse of discretion the trial court’s determination that particular facts are substantial and compelling reasons for the departure imposed. Babcock, 469 Mich at 264-265. Babcock succinctly circumscribed the abuse of discretion standard of review in this context:
At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more *333 than one reasonable and principled outcome. When the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court’s judgment. An abuse of discretion occurs, however, when the trial court chooses an outcome falling outside this principled range of outcomes. [Id. at 269 (emphasis added; citations omitted).]
In Babcock, we thoroughly analyzed the distinct duties of the trial court and reviewing court. In rejecting de novo review and adopting the abuse of discretion standard, we observed: “Because of the trial court’s familiarity with the facts and its experience in sentencing, the trial court is better situated than the appellate court to determine whether a departure is warranted in a particular case.” Id. at 268. We further stated:
The structure and content of the sentencing guidelines, as well as the organization of the appellate system itself, plainly reveal the Legislature’s recognition that the trial court is optimally situated to understand a criminal case and to craft an appropriate sentence for one convicted in such a case.
It is clear that the Legislature has imposed on the trial court the responsibility of making difficult decisions concerning criminal sentencing, largely on the basis of what has taken place in its direct observation. [Id. at 267-268.]
The trial court’s preeminence in the sentencing arena is reflected in the plain language of the statutory sentencing scheme, which provides that the court “may” depart from the appropriate range, MCL 769.34(3), and may even depart on the basis of an offense characteristic taken into account by the guidelines if the court concludes that the guidelines give it inadequate or dispro *334 portionate weight, MCL 769.34(3)(b). Babcock, 469 Mich at 267-268. MCL 769.34(11) provides a basis for the appellate court’s role:
If, upon a review of the record, the court of appeals finds the trial court did not have a substantial and compelling reason for departing from the appropriate sentence range, the court shall remand the matter to the sentencing judge or another trial court judge for resentencing under this chapter. [MCL 769.34(11) (emphasis added).]
Accordingly, an appellate court’s task is to review the record to determine whether the facts support the departure. Remand for resentencing is warranted only if the record does not support the departure.[4]
The majority’s current decision is inconsistent with MCL 769.34, Babcock, and Fields. The text of MCL 769.34(3) bears repeating:
*335 A court may depart from the appropriate sentence range established under the sentencing guidelines set forth in chapter XVII if the court has a substantial and compelling reason for that departure and states on the record the reasons for departure. [MCL 769.34(3).]
Thus, the sentencing court is obligated to have “a substantial and compelling reason for that departure” and to “stateD on the record the reasons for departure.” As I explained in my partial dissent to the Babcock decision, these are the sole elements that the statute requires to justify a departure sentence. Babcock, 469 Mich at 275 (CORRIGAN, J., dissenting in part). The Babcock majority went further than I would have, imposing a burden of articulation that is absent from the statute. See id., part III(C), at 258-261. Significantly, however, even the majority agreed that “[although the trial court must articulate a substantial and compelling reason to justify its departure, the trial court is not required to use any formulaic or ‘magic’ words in doing so.” Id. at 259 n 13 (emphasis added). Indeed, the majority explicitly counseled that the trial court need not “explain why it chose a twelve-month departure as opposed to an eleven-month departure (or indeed as opposed to any one of countless other potential departures).”[5] Id. at 260 n 14. Kather, “however it is articulated, the quality of the trial court’s statement must be sufficient to allow for effective appellate review.” Id. at *336 259 n 13. The current majority cites its decision in Babcock and claims: “We do not suggest that trial courts must sentence defendants with mathematical certainty.” Ante at 311. Yet the majority now requires mathematical charting and magic words. In doing so, it abandons the abuse of discretion standard inherent in appellate courts’ review of trial courts’ sentencing decisions. Instead of acknowledging that there will always be a range of principled outcomes, the majority requires a trial court to impose sentences with precision and locate each sentence on an elusive scale of possible sentences for the underlying conviction. No longer must a reviewing court “proceed with a caution grounded in the inherent limitations of the appellate perspective.” Id. at 270.
Requiring precise comparisons of sentences for different hypothetical crimes and offenders also establishes a task for trial courts that is both potentially impossible and unnecessary to limit their discretion or facilitate review. The Legislature affirmatively chose to limit trial courts’ discretion by requiring them to articulate “substantial and compelling reasons.” The phrase “substantial and compelling” had become a legal term of art which originated from this Court’s definition in Fields. Babcock, 469 Mich at 257. Fields established — on the basis of definitions of the words “substantial” and “compelling” — that such reasons must “ ‘keenly’ or ‘irresistibly’ grab our attention” and be “ ‘of considerable worth’ in deciding the length of a sentence.” Fields, 448 Mich at 67. Such reasons also must be “objective and verifiable.” Id. at 68. Requiring reasons for departure to be objective and verifiable “maintain[s] the limited but moderating effect intended by the Legislature” in allowing for departures. *337 Id. The standard “allows judges to consider many of the factors traditionally utilized in formulating sentences” while “also providing] sufficient restrictions to assure that the Legislature’s intent... will not be subsumed by the use of what is intended to be an exception to the rule____” Id. at 68-69. Thus, the standard itself embodies limits for departure that appellate courts are capable of reviewing. It is no accident, therefore, that the trial court need only articulate “substantial and compelling reasons” for a departure sentence to survive review under MCL 769.34(11) (resentencing is appropriate only if “the court of appeals finds the trial court did not have a substantial and compelling reason for departing from the appropriate sentence range”). More is unnecessary because the range of substantial and compelling reasons is inherently limited. As I will explain further, this standard also reflects the potential impossibility of articulating reasons for a particular number of months or years of departure in any meaningful, reviewable way.
Although the majority calls for uniformity among departure sentences, ante at 311-312, 314, the majority cites no controlling statutory provision prescribing the methods it requires to achieve such uniformity. The majority cites only MCL 769.33(1)(e)(iv), which has been repealed. 2002 PA 31. Moreover, this repealed statutory provision merely provided direction to the Sentencing Commission regarding ways to modify the sentencing guidelines. It did not delineate a judge’s duties in imposing a sentence outside of the guidelines. Further, although MCL 769.33(1)(e)(iv) provided that the Sentencing Commission should develop modifications to the sentencing guidelines that “[r] educe sentencing disparities,” it did not require the standard of uniformity envisioned by the majority for sentences outside the guidelines range. Because of their unusual nature, departure sentences are not governed by the *338 general rule of uniformity applied to those more common offenses that fit within the mold of the guidelines. “Departure” is defined, in pertinent part, as “divergence or deviation, as from a standard or rule.” Random House Webster’s College Dictionary (2001). Thus, departure sentences should by definition be governed by a different standard than sentences within the guidelines range. By choosing to permit judges to “depart” from the guidelines range for unusual offenses, the Legislature contemplated a less stringent standard of uniformity for unusual offenses, which should because of their nature be treated differently.[6] Departure sentences generally involve less quantifiable[7] facts that are not adequately covered by the normative guidelines.[8] In Babcock, 469 Mich at 264, this Court ex *339 plained that a sentencing court departing from the guidelines range “must consider whether its sentence is proportionate to the seriousness of the defendant’s conduct and his criminal history. ..(Emphasis added.) By effectively requiring sentencing courts to compare the defendant’s conduct and criminal history to other defendants’ conduct and criminal histories, the majority has created a standard of uniformity not required by statute or Babcock.
This case exemplifies the majority’s mistake in requiring trial courts to offer burdensome articulations of their sentencing decisions mandated neither by MCL 769.34(3) nor precedent from this Court. The facts of this case clearly reveal that the 30-year minimum sentence imposed is within the range of principled outcomes. These facts also reinforce the Babcock Court’s conclusion that “[t]he deference that is due [to the trial court under the abuse of discretion standard] is an acknowledgement of the trial court’s extensive knowledge of the facts and that court’s direct familiarity with the circumstances of the offender.” Babcock, 469 Mich at 270. The trial court’s sentence is firmly rooted in the heinous nature of this case, in which the *340 child victim effectively became the sexual prisoner of her adult caretaker and landlord, who threatened to put the child’s family out into the street if she did not submit to his abuse.
The single mother of the victim first met defendant and his wife when the little girl was just over one year old. The mother sought day care for her daughter and responded to an ad placed in the paper by defendant’s wife. Several of his wife’s ads were introduced at trial; she advertised her babysitting services[9] as a “mom away from home” in a “healthy,” “experienced, loving, clean environment.” Defendant’s wife cared for the child in her home intermittently. The child and her younger sister later began staying with defendant and his wife (the Smiths) for long stretches, including over whole summers. The Smiths also took in the children for nine months when their mother was living in a halfway house.
The Smiths testified that the child was initially afraid of everyone or “afraid of men.” But all the witnesses agreed that, over time, defendant and the child developed a father-daughter relationship. The child testified that she loved the Smiths, who sent her gifts and cards even when she was not in their care.[10] The Smiths testified that they began to think of the child as their own. Defendant, whom she sometimes called “daddy,” was the only consistent male role model in her life.
Defendant molested the child over a 15-month period when she was nine and ten years old. The abuse began *341 when she and her sister moved in with the Smiths during a summer while their mother was still living in Georgia and preparing to move the family back to Michigan. In the fall when she returned to Michigan, the mother, who was in financial straits, and her infant son also moved in with the Smiths at the request of defendant’s wife but over defendant’s objection. Defendant’s abuse of the child continued when defendant’s wife worked on her computer in the basement[11] and the *342 child’s mother was either at work or in her bedroom. When defendant and the child were alone in the living room watching television and the child was lying down on the couch, he would put his hand down her pants and use his fingers to penetrate and rub her genitals and anus. She testified that defendant’s acts “hint” and made her feel like her skin was “stretching.” The child would leave the room when she could. She testified that she would attempt to move her body away from defendant’s hand, but he would often stiffen his arm so she could not move.[12] On one occasion, defendant also rubbed himself and made a “wet spot” on his shorts. On this occasion, he told the child that he would “kick [her] family out” of the house if she told anyone about the abuse.
*343 The child testified that she initially did not tell anyone what defendant was doing to her because she was too embarrassed, upset, and afraid of defendant’s threats to evict her family. Ultimately, about a month after the last incident of abuse, she asked a friend’s teenaged brother whether “he would ever hurt a little girl while they [sic] are sleeping.” She then began sucking her thumb. Her behavior spurred him to ask her what was wrong. She revealed the abuse after asking him not to tell anyone her secret. The boy testified that, when she told him, he was “in complete shock.” He could not sleep and concluded that he “couldn’t live with [a secret] like that.” The next morning, he convinced the victim to tell his mother and sister about the abuse.[13]
The boy’s mother then reported the abuse to defendant’s wife and the victim’s mother. The victim told her mother that the allegations were true. As the victim’s family gathered their things to immediately leave the Smiths’ house, defendant’s angry wife accused the victim’s mother of lying and spat in her face. Defendant, whose wife had repeated the allegations to him, sat quietly in a chair throughout the ordeal. At trial, he testified that the child’s allegations were untrue.
After leaving the Smiths’ home, the child’s mother called the police, who took the child’s statement and advised her mother to take her to the hospital where she was examined for signs of sexual abuse. The child described the complete genital and anal exam as uncomfortable and embarrassing. The pediatric emergency room doctor who examined her testified that the child, who was then ten years old, reverted to thumb-sucking during the exam process.
*344 Defendant was charged with three counts of first-degree criminal sexual conduct involving the sexual penetration of a child under 13 years old. A brief review of the defense theory provides a useful background for the trial judge’s later comments at the sentencing hearing. The defense initially stressed the questionable character of the victim’s mother. Defense counsel noted an allegation made by defendant’s wife that, after the prehminary examination in this case took place, someone who sounded like the victim’s mother telephoned her and asked for $20,000 to make the case “go away.”[14] Counsel *345 argued that the child’s allegations “could be an imagined thing” and were like a “lie” or a “rumor.” Counsel also argued that the ten-year-old victim may have made up the story in order to spend more time with her friend’s teenaged brother, on whom she may have had a romantic crush. Counsel further suggested that the child did not appear traumatized because she continued to do well at school throughout the ordeal.
The jury found defendant guilty of each of the three counts of first-degree criminal sexual conduct. The trial judge imposed a departure sentence of 30 to 50 years’ imprisonment for each count. Judge Kenny’s full reasons for departure are recounted in the majority opinion, ante at 297-298. Judge Kenny stressed that the case “manifests the absolute worst type of exploitation.” Over a period of 15 months defendant forced a child with no other adult males in her life, who was “fearful of the fact that she may lose the roof over her head for herself, her mother, and her two siblings,” to “silently endure” repeated sexual penetrations. Judge Kenny also noted that the ordeal forced the young victim to undergo a “frightening gynecological type of examination certainly adding to the trauma in this particular case.” Finally, defendant “blame[d] the child” and “categorize[d] her as a liar.”
As the majority acknowledges, Judge Kenny thus identified objective and verifiable facts underlying his sentencing decision, each of which is supported by the record. Ante at 301-302. Contrary to some of the majority’s conclusions, however, I conclude that the judge *346 also did not abuse his discretion in deciding that these facts were substantial and compelling reasons to impose a 30-year departure sentence.[15]
First, I agree with the majority that Judge Kenny was not barred from relying on defendant’s exploitation of his position as a caregiver to the child by MCL 769.34(3)(a), which prohibits a judge from departing on the basis of a defendant’s lawful occupation. Ante at 298 n 3. Judge Kenny appropriately cited defendant’s “cho[ice] to exploit [his] relationship” with the victim — or to abuse his status as a “child care provider” — as a reason for departure. Defendant preyed on a child to whom he became like a father — and who had no other men in her life to protect her — by taking advantage of his wife’s solicitation of the child to their care by advertising a safe environment for children. By its terms, MCL 769.34(3)(a) could not apply to this case because defendant was not lawfully employed as a child care provider; indeed, he and his wife testified that he was rarely involved with her unlicensed babysitting services. But even if defendant had worked as a child care provider, his exploitation of that role — as opposed to the mere fact of his lawful occupation — would be a sound reason for departure.[16]
Second, I also agree with the majority’s conclusion that the gynecological examination underwent by the 10-year- *347 old victim is a substantial and compelling reason to depart under the circumstances of this case. Ante at 302. This case involves a 10-year-old girl undergoing the first gynecological exam of her life under the auspices of criminal investigation. Further, the child’s reversion to thumb-sucking during the embarrassing, uncomfortable exam was apparently a noteworthy fact in this case; the experienced pediatric emergency room doctor explicitly remembered this fact and remarked on it at trial. Under these circumstances, the trial judge reasonably concluded that the exam “add[ed] to the trauma in this particular case” and, therefore, was one of several factors that contributed to his decision to depart from the minimum guidelines.
I strongly disagree, however, with the majority’s conclusion that the trial court’s reasons did not justify the 30-year minimum sentence (in the language of MCL 769.34[3], “that departure”) imposed. First, contrary to the majority’s claim, ante at 302-303 n 21, the judge clearly stated that he departed in part on the basis of exploitation of the victim because the level of exploitation here was not contemplated by the guidelines. Offense variable (OV) 10 addresses predatory conduct, exploitation of a victim’s age or size, and an offender’s abuse of his position of authority or domestic relationship to complete a crime. MCL 777.40. MCL 769.34(3)(b) mandates:
The court shall not base a departure on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight.
Here, the judge listed numerous forms of exploitation such as defendant’s abuse of a father-daughter type relationship, the age of the child, the child’s particular vul *348 nerability because she had no other males in her life, and defendant’s act of extorting her silence by threatening eviction of her whole family. The judge thus concluded that the case involved the “worst type of exploitation.” After citing Babcock and commenting on these facts, Judge Kenny stated that “[t]hese are characteristics that I think don’t get adequately get covered in the guidelines. ” Thus, the judge did exactly what MCL 769.34(3)(b) and Babcock require; he explained that the OVs did not give adequate weight to the exploitation involved in this case. See Babcock, 469 Mich at 258 n 12. I see absolutely no justification in MCL 769.34 or Babcock for the majority’s conclusion that the judge was also required to explicitly mention OV 10 in order to support his explanation. Rather, as required by statute, he stated that the offense “characteristic [of exploitation] has been given inadequate or disproportionate weight” by the guidelines. MCL 769.34(3)(b) (emphasis added). Even if it were necessary to name a particular OX he referenced OV 10 in an obvious manner because that OV is entitled “exploitation of a vulnerable victim.” MCL 777.40(1). Thus, I fail to understand how the majority is “unable to ascertain whether he believed the factor was given inadequate weight.” Ante at 303 n 21. Moreover, I find it hard to believe that Judge Kenny may have “failed to recognize that the guidelines consider exploitation,” ante at 303 n 21, not only because he is an experienced trial judge but because he acknowledged the guidelines range in this case as scored by the Department of Corrections; the score plainly included 10 points for OV 10. Requiring more of a trial judge here amounts to mandating the very sort of “magic” words that Babcock purported not to require. Babcock, 469 Mich at 259 n 13. It also runs counter to the majority’s current claim that “precise” words are not “necessary... to justify a particular departure.” Ante at 311, citing Babcock at 259 n 13.
*349 In sum, I agree with the Court of Appeals panel that 30-year sentences are well within the range of principled outcomes for these heinous acts of abuse.[17] The *350 trial judge’s stated reasons adequately justify the departure and are sufficient for appellate review. Unlike the majority, it is not “unclear” to me “why a minimum sentence of 30 years’ imprisonment is warranted for this defendant.” Ante at 319. To the contrary, the record clearly supports the departure. The majority asserts that I “fail[] to identify where in the record the judge justified the particular departure imposed,” and that I “cannot identify it because the trial judge failed to provide it.” Ante at 312. Such comments exemplify the majority’s incorrect reading of the statute and what it requires of the record for a departure sentence to survive review. The trial court is not required to state on the record with precision his reasons for the exact number of months or years he departs above the guidelines range. Rather, the record must support the departure. MCL 769.34(11) clearly requires the review *351 ing court to “review ... the record” in order to evaluate whether “the trial court did not have a substantial and compelling reason for departing.” But, instead of reviewing the record to determine whether the facts justify the departure imposed, the majority searches for statements quantifying the extent of departure. Despite its claims to the contrary, the majority requires a sentencing court to provide a quantitative analysis of how a particular departure relates to the offense variables, prior record variables, and sentencing grid. Such an explanation by the sentencing court may be helpful to justify a departure in a particular case or to facilitate appellate review. But this sort of detailed justification is not required by the Legislature’s statutory scheme, which only requires a court to “ha[ve] a substantial and compelling reason for that departure and state[] on the record the reasons for departure.” MCL 769.34(3).[18] *352 Indeed, the majority today creates a corollary guidelines scheme for departure sentences from whole cloth and imports it through a single word — “that”—in MCL 769.34(3) {“that departure”).
The nature of the requirements of the plain text of the statutes, which the majority’s holding ignores, reflects the fact that the Legislature continues to grant sentencing discretion to trial courts, even in the wake of legislatively enacted sentencing guidelines, because each case is unique and only the trial judge is directly familiar with the facts and circumstances of the offense and offender. See Babcock, 469 Mich at 270. They also reflect the difficulty of quantifying individualized sentences.
The United States Supreme Court recently provided guidance concerning how appellate courts may meaningfully review sentencing decisions while preserving trial courts’ sentencing discretion in Gall v United States, 552 US _; 128 S Ct 586; 169 L Ed 2d 445 (2007). Although the federal sentencing guidelines differ from the Michigan scheme and are no longer mandatoiy, federal judges must *353 consult the guidelines and, as in Michigan, a departure from the specified range is reviewed for an abuse of discretion. Id. at _; 128 S Ct at 594. Appellate courts defer to trial courts’ sentencing discretion in part due to practical considerations. As the Gall Court observed:
“The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record.” Brief for Federal Public and Community Defenders et al. as Amici Curiae 16. “The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court.” Rita [v United States, _ US _; 127 S Ct 2456, 2469; 168 L Ed 2d 203 (2007)]. Moreover, “[district courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do.” Koon v. United States, 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). [Id. at _; 128 S Ct at 597-598.]
While acknowledging that “appellate courts may... take the degree of variance into account and consider the extent of a deviation from the Guidelines,” the Gall Court “reject[ed] the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence.” Gall, 552 US at _; 128 S Ct at 595. Most significant to our purposes, the Court observed that mathematical approaches “assume[] the existence of some ascertainable method of assigning percentages to various justifications.” Id. at _; 128 S Ct at 596. “The [percentage] formula is a classic example of attempting to measure an inventory of apples by counting oranges.” Id.
I fear that the majority today similarly attempts to measure apples by counting oranges. Although rooting a departure sentence in the factors considered by the *354 Michigan sentencing guidelines may be helpful in a given case, it will often be antithetical to courts’ ability to exercise their sentencing discretion. For instance, how can a trial or appellate court measure the extent of departure appropriate for the level of exploitation present in this case? Should defendant’s act of extorting silence from the child — in the words of the majority, of “forc[ing] the child to choose between reporting the defendant’s repeated criminal assaults and protecting her family from homelessness,” ante at 301 — be weighed at twice the maximum score for OV 10? Ten times that score? I agree with the majority that proportionality is in part rooted in the egregiousness of the offense, ante at 305, quoting Babcock at 263, and therefore that relatively higher sentences will be warranted for offenders with lower prior record variable scores whose egregious crimes nonetheless are not adequately contemplated by the OV scores, ante at 308. But I fail to see how Judge Kenny fell short in his obligation to “comply reasonably with [his] obligations under the guidelines,” ante at 319, when he explained in detail his reasons for concluding that this defendant is precisely such an offender.
Indeed, complying with the majority’s regime will be essentially impossible in the many cases where trial courts depart on the basis of unique characteristics that are not contemplated by the guidelines at all and not present for comparison in other cases. I respectfully suggest that here Judge Kenny could do no more than point to the record of this heinous case of abuse to explain his reasons for departing under these unique circumstances. No amount of charting the offense by reference to the guidelines would reveal a correct departure sentence or departure range because we cannot quantify the circumstances of this crime or the exploitation involved. Individualized sentencing often simply *355 is not amenable to this level of precision and further articulation by the trial court would not meaningfully aid in review.[19] As stated by Fields and reflected in MCL 769.34(11), the requirement that a trial court state attention-grabbing, objective and verifiable reasons for departure itself “provides sufficient restrictions to assure that the Legislature’s intent. . . will not be subsumed by the use of what is intended to be an exception to the rule . . ..” Fields, 448 Mich at 68-69.
To the extent the majority asserts that its regime is necessary to facilitate proportionality, it appears to ignore that the Babcock decision thoroughly considered the goal of proportionality when it established abuse of discretion as the appropriate standard for review of sentencing departures. Ante at 304-305; Babcock, 469 Mich at 261-264. In Gall, the United States Supreme Court approved of its decision in Koon to adopt an abuse *356 of discretion standard of review. The Gall Court observed: “Even [in Koon] we were satisfied that a more deferential abuse-of-discretion standard could successfully balance the need to ‘reduce unjustified disparities’ across the Nation and ‘consider every convicted person as an individual.’ ” Gall, 552 US at _; 128 S Ct at 598 n 8, quoting Koon, 518 US 113 (emphasis added).
Contrary to the majority’s approach, Michigan law— like federal law — requires simply that a trial court “adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.” Gall, 552 US at _; 128 S Ct at 597; see also Babcock at 259 n 13 (“[H]owever it is articulated, the quality of the trial court’s statement must be sufficient to allow for effective appellate review.”). Because of the intangible nature of sentencing factors, adequate explanation is all we can ask of trial courts. Here Judge Kenny complied with the requirements of MCL 769.34(3) by stating his intention to depart and his reasons for departure. He complied with MCL 759.34(3)(b) by explaining that the guidelines did not adequately cover the circumstances of the offenses. He aided appellate review by explaining his reasons for departure in detail and explicitly recognizing his duties under Babcock. By requiring still more from trial judges, the majority now imposes an unreasonably burdensome task on parties and judges, who will be required to debate the specific degree to which the guidelines are over- or under-inclusive of particular factors and quantify the effect of factors not addressed by the guidelines. Yet, because these issues are not easily quantifiable, appellate courts will remain able only to answer the central questions: does the record reflect that the trial court had a substantial and compelling reason to depart and, if so, was the sentence outside the range of principled outcomes? MCL *357 769.34(11); Babcock, 469 Mich at 269. The majority thus assigns litigants and trial judges a time-consuming and potentially impossible task that is irrelevant to the statutory directives concerning a trial judge’s substantial and compelling reasons for departure.
I would retain the current, workable standard. As in the federal context, an appellate court
may consider the extent of the deviation [from the guidelines], but must give due deference to the [trial] court’s decision that the [sentencing] factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal.... [Gall, 552 US at _; 128 S Ct at 597 (emphasis added).]
This prohibition on an appellate court substituting its judgment for that of the trial court constitutes the very heart of the abuse of discretion standard of review. Because the sentences imposed fall within the range of reasonable opinions regarding what sentences are appropriate in this case, they do not constitute an abuse of discretion. Accordingly, I would affirm defendant’s sentences.

 Under MCL 750.520b(2), defendant was automatically eligible to serve a life sentence for each of his three convictions for first-degree criminal sexual conduct.

 It also may be helpful to compare sentences in similar cases, as Justice Makkman suggests. I do not oppose trial courts’ attempts to do so. My central point is that our statutory scheme simply does not require this exercise. Moreover, because each case is unique, the comparison Justice Makkman advocates may not always be possible or productive. Significantly, Justice Markman concedes that his approach may have “some anecdotal or arbitrary quality. . . . ” Ante at 325. I agree. But I also question whether case comparisons will become meaningfully less arbitrary over time, as Justice Makkman supposes, if judges “consider reasonably similar cases decided by themselves or by geographically *332 proximate judges.” Ante at 324-325. Rather, such comparisons have the potential to increase disparities in local sentencing practices, contrary to Justice Markman’s stated goal of statewide consistency in guidelines sentencing. Thus, Justice Markman’s position that judges should compare similar cases before imposing a sentence outside the guidelines range, which would likely lead to inconsistent sentencing practices in regions throughout the state, is inconsistent with his position that courts should ensure uniform sentences.

 The majority explicitly states that a trial court “is not required to consider where a defendant’s sentence falls on the sentencing range grid,” and that appellate review is merely “aided” when a court compares its reasons for departure to facts describing a real or hypothetical crime meriting the same sentence. Ante at 309, 310.

 I agree with the majority that “appellate courts may not review the record to search for reasons to uphold a sentence that the trial court failed to justify.” Ante at 314 n 50, citing Babcock, 469 Mich at 258-259. Rather, an appellate court reviews the record to determine whether the record supports the trial court’s reasons for departure. My central point is that an appellate court’s role is to review the record for an abuse of discretion, not to legally analyze the trial court’s attempts to derive the departure from the guidelines or analogize it to other cases. Indeed, although Justice Markman accuses me of promoting merely “rudimentary appellate review,” ante at 322, my fear is that the majority’s formula will promote incomplete scrutiny of departure sentences. Instead of carefully reviewing the entire record to determine whether a trial court’s sentence falls outside the range of principled outcomes, under the majority’s view an appellate court can restrict itself to the sentencing transcript to check for an adequate quantitative argument or comparison to other cases. By permitting appellate courts to restrict their review to the sentencing transcript and a comparison with other cases, rather than requiring a complete review of the facts as recounted in the entire record, the majority permits what resembles de novo review of a legal question, which we explicitly rejected for departure sentences in Babcock in favor of the abuse of discretion standard.

 I agree with Justice Makkman that “there is a considerable difference between a 16-year and a 30-year minimum sentence.” Ante at 321. But, as Babcock explicitly counsels, a trial court is not required — and indeed may not be able — to precisely quantify the reasons for the precise departure sentence imposed. Still, in choosing not to impose such a requirement, the statutory scheme does not “essentially exempt... that part of a potential criminal sentence lying outside the guidelines range ... from even rudimentary appellate review.” Ante at 322. Record review of the reasons for departures is anything but rudimentary, as our work in this case itself most poignantly and painfully illustrates. Appel *336 late courts are fully capable of fulfilling their task of reviewing the record to discern whether the facts support the departure as an appropriate exercise of discretion.

 I agree with the majority that appellate courts should not impose a less stringent standard of review (i.e., abuse of discretion) on departure sentences, ante at 315 n 51, but I disagree that the Legislature intended to bind trial courts departing from the sentencing guidelines range to the standard of uniformity required for sentences within the guidelines.

 Justice Markman argues that the facts in cases involving departure sentences are just as quantifiable as the facts in cases in which the sentence is within the guidelines. If the facts of a case are quantifiable, however, then they can he scored adequately by the offense and prior record variables, thus resulting in a sentence within the guidelines range. It is when objective and verifiable factors exist that cannot adequately be scored by the offense and prior record variables (i.e., they are not adequately quantifiable) that a departure sentence results. Thus departure sentences by their nature involve less quantifiable facts than sentences within the guidelines.

 Moreover, the majority does not acknowledge the extent to which the standards for departure sentences parallel those for guidelines sentences. The majority fears that my view would lead to “[a]ny arguably reasonable sentence [being] upheld.” Ante at 314.1 conclude that this is precisely what the Legislature intended for both departure sentences and nondeparture sentences. Departure sentences are constrained by the statutory maximum and the rule requiring that a minimum sentence not exceed 2h of the maximum, MCL 769.34(2)(b). Within this range, a departure sentence is reasonable if it is supported by a substantial and compelling reason. MCL *339 769.34(3). Similarly, a nondeparture sentence is constrained by the minimum guidelines range. MCL 769.34(2). A sentence is presumptively reasonable if it falls within this range and must be affirmed. MCL 769.34(10). Thus, departure and nondeparture sentences are accorded appellate deference if they fall within the statutorily constrained parameters. Because a sentencing judge need not justify the exact nondeparture sentence he imposes within the minimum guidelines range, there is nothing novel about the Legislature’s decision not to require quantification of a departure sentence that otherwise complies with the statutory constraints for departure sentences. Indeed, by requiring quantification of departure sentences, the majority erects a higher bar for departure sentences with regard to uniformity than exists for guidelines sentences themselves. This cannot be the correct result; by design, departure sentences are appropriate in cases that defy norms and do not easily lend themselves to common offense and offender characteristics.

 Defendant’s wife emphasized at trial that she did not operate a licensed day care business. She merely wanted to “baby-sit a couple of children.”

 The child’s mother frequently moved the family between Michigan and Georgia.

 Several witnesses confirmed the child’s testimony that defendant’s wife spent hours in her basement “office” using her computer during the evening. Defendant claimed, to the contrary, that he was with his wife “24 hours a day, seven days a week” because his wife was agoraphobic. Other points of the Smiths’ testimony clearly belied this claim. For instance, they did not sleep in the same room; rather, they testified that she went to bed early and slept in their bedroom while he watched television and slept in the living room where the abuse took place. Defendant also denied that his wife had a computer in her basement office. His wife initially supported his testimony; she claimed that she used a laptop in the living room and not in the basement. She later conceded, however, that she used the computer at night in the basement.
These are but some examples of the apparent inconsistencies within and between defendant’s testimony and that of his wife. The regular inconsistencies, as well as the couple’s behavior at trial, shed light on the trial judge’s observations at sentencing. For instance, the judge observed that in addition to sexually abusing the child who had come to utterly trust defendant, defendant then added to the child’s ordeal by casting her as a liar at trial. In all, the child was subjected to two trials, and the judge opined that defendant and his wife attempted to spur a second mistrial by accusing the trial prosecutor of cocaine use during the lunch breaks. During the second trial, defendant’s wife engaged in behavior that, after a hearing outside the jury’s presence, the judge characterized as “stalking” the prosecutor. Defendant’s wife made repeated calls to state police at the Downriver Area Narcotics Organization to lodge complaints against the prosecutor and encourage the officers to investigate. The officers stated that defendant’s wife claimed to have followed the prosecutor in her car at lunch breaks dining the trial (it is unclear from the transcript whether defendant, who was free on bond, was with her at these times). His wife reported the prosecutor’s license plate number and claimed to have seen her using cocaine during the lunch breaks before returning to the courtroom. When called on by the judge to respond to the officers’ statements, defendant’s wife denied that she ever told them *342 that she followed the prosecutor or reported seeing her use cocaine and claimed that she only reported her suspicions of drug abuse because of the prosecutor’s behavior in the courtroom. She claimed that she only wanted to get the prosecutor some help. Judge Kenny opined that the timing of her behavior indicated that, at a minimum, she hoped to cause embarrassment for the prosecutor during the trial and, likely, she hoped to cause the prosecutor’s arrest and another mistrial. Judge Kenny clearly surmised that defendant was involved in some way with these attempts to malign the prosecutor; the judge ultimately revoked defendant’s bond in an attempt to curb this disruptive and threatening behavior. The judge characterized the behavior exhibited by defendant’s wife as “reprehensible,” banned her from the courtroom, and encouraged the prosecutor to seek a personal protection order. He opined: “In 31 years . . . working in the criminal justice system, I have never seen anything. . . that stooped to the depth of effort to try to tamper with the integrity of this particular trial or trial process. The only thing that would be worse would be trying to shoot a witness or the prosecutor.” Indeed, in keeping with the majority’s approach despite my disagreement with it, on remand I would note that these events could have been considered under offense variable (OV) 19, which addresses interference with the administration of justice but which was not initially scored in this case. Arguably, even a score for OV 19 would not adequately account for the level of interference Judge Kenny found in this case.

 It is worth noting that, according to the record, defendant stands six feet and two inches tall and weighs between 290 and 311 pounds.

 His mother described the victim as “crying and crying” and “shivering.”

 Very little evidence of this purported call was presented at trial and defense counsel only mentioned it in passing during his closing argument. At the time of the call, defendant’s wife did not file a report or contact the police officers investigating the case. Rather, she stated that she called a “dispatch” officer who she claimed told her to contact her phone company and have a tracer placed on her phone. A friend of the Smiths testified that she was at their home on the day of the call and that she recognized the voice of the victim’s mother demanding money. She stated that defendant’s wife had recognized the out-of-state number on her caller I.D. box and asked the friend to listen on the other line. No phone company reports or other direct evidence of the call were submitted into evidence. Indeed, the prosecutor argued that defendant’s wife and her friend fabricated the call, particularly in light of the friend’s convenient presence when the purported call was made, their failure to report it to the investigating officers, and their incredible claims that defendant’s wife was told to put a “tracer” on the phone although the caller I.D. box purportedly showed the caller’s phone number.
Further, there are obvious similarities between the accusations made by defendant’s wife against the victim’s mother and those she made against the prosecutor. Defendant’s trials were rife with his wife’s constant pattern of implausible accusations against participants in the case. Judge Kenny was in the best position to gauge any encouragement of her behavior by defendant. At a minimum, the record does not reveal any efforts by defendant to curb the behavior. I note these issues because her behavior formed part of the context of the trial and sentencing decisions, by their nature, “ ‘grow [] out of, and [are] bounded by, case-specific detailed factual circumstances.’ ” Babcock, 469 Mich at 268, quoting Buford v United States, 532 US 59, 65; 121 S Ct 1276; 149 L Ed 2d 197 (2001). To the extent that Judge *345 Kenny concluded defendant was complicit in his wife’s acts, the record further supports the judge’s observation at sentencing that, in addition to the incredibly exploitative abuse itself, defendant added to the child’s ordeal by categorizing her as a liar. Indeed, defendant did so during two trials and, had his wife spurred a second mistrial, the child would have been forced to endure a third trial.

 Consistent with my dissent in Babcock, I would affirm defendant’s sentences because Judge Kenny stated one or more substantial and compelling reasons for departure and the sentence imposed was not outside the range of principled outcomes. MCL 769.34(3) and (11) require no more in order for a departure sentence to survive appellate review. Babcock, 469 Mich at 274-277 (CORRIGAN, J., dissenting in part). But the sentence is also sound, and remand is not required, under the majority-opinion in Babcock, as I will explain.

 MCL 769.34(3)(a) prohibits reliance on the mere fact of a defendant’s occupation as a reason for departure. It reads in pertinent part: “The court shall not use an individual’s... legal occupation... to depart from the appropriate sentence range.”

 Because of the timing of this case, we also happen to have a unique window onto whether our Legislature would conclude that a 30-year sentence is within the range of principled outcomes under these circumstances. Effective July 1, 2008, an adult who rapes a child, i.e., commits first-degree criminal sexual conduct against a child less than 13 years of age, must be imprisoned for a minimum term of at least 25 years. Such an offender is also still eligible for a life sentence. MCL 750.520b(2)(b), as amended by 2007 PA 163. Thus, if defendant had committed these offenses at a later date, he would be required to serve a minimum sentence of 25 years or more. Moreover, the 25-year sentence would be mandatory even if there were no substantial and compelling reasons to depart upward. Judge Kenny’s reasons for departure would certainly justify a 30-year minimum sentence (a mere increase of five years from the mandatory minimum) under the new scheme.
Further, on a national scale, a debate continues regarding whether capital punishment is an appropriate sentence for child rape. The United States Supreme Court recently struck down a statute providing for such punishment when the crime is not also intended to kill the child. Kennedy v Louisiana, _ US _; 128 S Ct 2641; 171 L Ed 2d 525 (2008). But, as Justice Alito observed in dissent, six states currently permit capital punishment for child rape convictions. Id., _ US at _; 128 S Ct at 2665 (Alito, J., dissenting). Justice Alito also reasonably questions the Kennedy plurality’s conclusion that there is genuinely a “national consensus” that capital punishment is inappropriate in such cases. Id. Moreover, although Justice Kennedy’s lead opinion also cited the absence of capital punishment as a sanction for child rape in the context of federal criminal law, id., _ US at _; 128 S Ct at 2652, the Department of Justice belatedly observed that the Court was mistaken in this regard; the rape of a child is a capital offense under the law of the United States Militaiy. See Linda Greenhouse, Justice Department Admits Error in Not Briefing Court, N.Y. Times, July 3, 2008 <http://www.nytimes.com/2008/07/03/us/03scotus.html> (accessed July 29, 2008). Justice Alito observed:
[T]here are many indications of growing alarm about the sexual abuse of children. In 1994, Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U.S.C. § 14071 (2000 ed. and Supp. V), which requires States receiving certain federal funds to establish registration systems for convicted sex offenders and to notify the public about persons convicted of the sexual abuse of minors. All *350 50 States have now enacted such statutes. In addition, at least 21 States and the District of Columbia now have statutes permitting the involuntary commitment of sexual predators, and at least 12 States have enacted residency restrictions for sex offenders. [Id., _ US at _; 128 S Ct at 2669-2671 (Alito, J., dissenting).]
He offered the following grim statistics:
From 1976 to 1986, the number of reported cases of child sexual abuse grew from 6,000 to 132,000, an increase of 2,100%. A. Lurigio, M. Jones, & B. Smith, Child Sexual Abuse: Its Causes, Consequences, and Implications for Probation Practice, 59 Sep Fed. Probation 69 (1995). By 1991, the number of cases totaled 432,000, an increase of another 227%. Ibid. In 1995, local child protection services agencies identified 126,000 children who were victims of either substantiated or indicated sexual abuse. Nearly 30% of those child victims were between the age of four and seven. Rape, Abuse & Incest National Network Statistics, online at http://www.rainn.org/get-information/statistics/sexual-assaultvictims. There were an estimated 90,000 substantiated cases of child sexual abuse in 2003. Crimes Against Children Research Center, Reports from the States to the National Child Abuse and Neglect Data System, available at www.unh.edu/ccrc/sexualabuse/Child%Sexual%Abuse.pdf. [Id., _ US at _; 128 S Ct at 2669 n 2.]

 This Court consistently and rightly criticizes such deviations from the Legislature’s intent as expressed in its unambiguous statutory text. For a prime example, this Court rejected courts’ attempts to superimpose atextual, judicially created rules on unambiguous text in Devillers v Auto Club Ins Ass’n, 473 Mich 562; 702 NW2d 539 (2005), and Rory v Continental Ins Co, 473 Mich 457; 703 NW2d 23 (2005). Devillers and Rory addressed the line of cases beginning with Tom Thomas Org, Inc v Reliance Ins Co, 396 Mich 588; 242 NW2d 396 (1976), in which courts allowed for judicial tolling of unambiguous time periods established by statute and contract. Devillers overruled Lewis v DAIIE, 426 Mich 93; 393 NW2d 167 (1986), because Lewis impermissibly grafted a judicial tolling doctrine onto a provision of the no-fault act, MCL 500.3145(1), that plainly afforded claimants one year from the time a loss was incurred to recover benefits. Devillers at 581. In doing so, Devillers “reaffirm[ed] the Legislature’s prerogative to set policy and our long-established commitment to the application of statutes according to their plain and unambiguous terms to preserve that legislative prerogative.” Id. Indeed, we appropriately characterized the Lewis Court’s superimposition of judicial tolling on the unambiguous statute as “crafting its own amendment” of the statute. Id. at 582. In Rory, we similarly overruled the attempts of Tom Thomas and its progeny to “abrogate unambiguous contractual terms” using “judicial assessments] of ‘reasonableness.’ ” Rory at 470.
*352 Thus, in both cases we recognized that we lack the power to import our own enhancements or exceptions when the Legislature or contracting parties have clearly established a governing regime.
The statutory requirements for imposing and reviewing departure sentences that we address here are equally clear. The Tom Thomas line of cases permitted judicial tolling to thwart the clear time periods circumscribing parties’ duties and rights as established by contract or statute. Here, the Legislature clearly circumscribes a court’s sentencing duties by requiring it to articulate substantial and compelling reasons to depart. And it further directs that appellate review of the departure is done by analyzing the record, not charting a defendant’s placement on a continuum. Yet the majority expands these clearly defined duties by imposing judicially created guidelines for departure. By doing so, the majority fails to recognize that this Court’s duty is to apply the statutory language “without addition, subtraction, or modification.” Lesner v Liquid Disposal, Inc, 466 Mich 95, 101; 643 NW2d 553 (2002). “We may not read anything into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself.” Id.

 In his partial dissent from the Babcock decision, Justice Cavanagh similarly stressed the futility of imposing artificial limitations on a trial judge’s discretionary sentencing decisions, albeit by rejecting the majority’s conclusion that reasons for departure must be objective and verifiable and suggesting an even more deferential approach. Babcock, 469 Mich at 279 (Cavanagh, J., dissenting in part). Justice Cavanagh observed:
[W]hat rises to the level of substantial and compelling is clearly subjective. “It relates to this defendant and to this sentencing judge, who is examining this individual and this offense.” [Fields, 448 Mich at 104 (Cavanagh, J., dissenting)] (emphasis in original). Thus, the weighing of all the factors and circumstances before the sentencing court includes inherently subjective inquiries.
Further,... [t]here are certain factors, such as a defendant’s remorse or a defendant’s family support, that may be considered objective by one sentencing judge and subjective by another. The dissent in Fields stated, “[t]he better test is whether the sentencing judge is satisfied that the nature and extent of the defendant’s remorse [or family support] are substantial and compelling reasons to support a sentencing departure.” Id. at 105. I remain committed to the position that the “objective” criteria utilized by this Court is [sic] unworkable. [Id. at 279-280.]