Justice Alito,
with whom Justice Scalia joins, dissenting.
The Court now holds that Congress and the legislatures of the 50 States are prohibited by the Constitution from identi *510 fying any category of murderers under the age of 18 who must be sentenced to life imprisonment without parole. Even a 17%-year-oId who sets off a bomb in a crowded mall or guns down a dozen students and teachers is a “child” and must be given a chance to persuade a judge to permit his release into society. Nothing in the Constitution supports this arrogation of legislative authority.
The Court long ago abandoned the original meaning of the Eighth Amendment, holding instead that the prohibition of “cruel and unusual punishment” embodies the “evolving standards of decency that mark the progress of a maturing society.” Trop v. Dulles, 356 U. S. 86, 101 (1958) (plurality opinion); see also Graham v. Florida, 560 U. S. 48, 58 (2010); Kennedy v. Louisiana, 554 U. S. 407, 419 (2008); Roper v. Simmons, 543 U. S. 551, 560-561 (2005); Atkins v. Virginia, 536 U. S. 304, 311-312 (2002); Hudson v. McMillian, 503 U. S. 1, 8 (1992); Ford v. Wainwright, 477 U. S. 399, 406 (1986); Rhodes v. Chapman, 452 U. S. 337, 346 (1981); Estelle v. Gamble, 429 U. S. 97, 102 (1976). Both the provenance and philosophical basis for this standard were problematic from the start. (Is it true that our society is inexorably evolving in the direction of greater and greater decency? Who says so, and how did this particular philosophy of history find its way into our fundamental law? And in any event, aren’t elected representatives more likely than unaccountable judges to reflect changing societal standards?) But at least at the start, the Court insisted that these “evolving standards” represented something other than the personal views of five Justices. See Rummel v. Estelle, 445 U. S. 263, 275 (1980) (explaining that “the Court’s Eighth Amendment judgments should neither be nor appear to be merely the subjective views of individual Justices”). Instead, the Court looked for objective indicia of our society’s moral standards and the trajectory of our moral “evolution.” See id., at 274-275 (emphasizing that “ ‘judgment should be informed by objective factors to the maximum possible extent’” (quoting *511 Coker v. Georgia, 433 U. S. 584, 592 (1977) (plurality opinion))).
In this search for objective indicia, the Court toyed with the use of public opinion polls, see Atkins, supra, at 316, n. 21, and occasionally relied on foreign law, see Roper v. Simmons, supra, at 575; Enmund v. Florida, 458 U. S. 782, 796, n. 22 (1982); Thompson v. Oklahoma, 487 U. S. 815, 830-831 (1988); Coker, 433 U. S., at 596, n. 10 (plurality opinion).
In the main, however, the staple of this inquiry was the tallying of the positions taken by state legislatures. Thus, in Coker, which held that the Eighth Amendment prohibits the imposition of the death penalty for the rape of an adult woman, the Court noted that only one State permitted that practice. Id., at 595-596. In Enmund, where the Court held that the Eighth Amendment forbids capital punishment for ordinary felony murder, both federal law and the law of 28 of the 36 States that authorized the death penalty at the time rejected that punishment. 458 U. S., at 789.
While the tally in these early cases may be characterized as evidence of a national consensus, the evidence became weaker and weaker in later cases. In Atkins, which held that low-IQ defendants may not be sentenced to death, the Court found an anti-death-penalty consensus even though more than half of the States that allowed capital punishment permitted the practice. See 536 U. S., at 342 (Scalia, J., dissenting) (observing that less than half of the 38 States that permit capital punishment have enacted legislation barring execution of the mentally retarded). The Court attempted to get around this problem by noting that there was a pronounced trend against this punishment. See id., at 313-315 (listing 18 States that had amended their laws since 1986 to prohibit the execution of mentally retarded persons).
The importance of trend evidence, however, was not long lived. In Roper, which outlawed capital punishment for defendants between the ages of 16 and 18, the lineup of the *512 States was the same as in Atkins, but the trend in favor of abolition—five States during the past 15 years—was less impressive. Roper, 543 U. S., at 564-565. Nevertheless, the Court held that the absence of a strong trend in support of abolition did not matter. See id., at 566 (“Any difference between this case and Atkins with respect to the pace of abolition is thus counterbalanced by the consistent direction of the change”).
In Kennedy v. Louisiana, the Court went further. Holding that the Eighth Amendment prohibits capital punishment for the brutal rape of a 12-year-old girl, the Court disregarded a nascent legislative trend in favor of permitting capital punishment for this narrowly defined and heinous crime. See 554 U. S., at 433 (explaining that, although “the total number of States to have made child rape a capital offense ... is six,” “[t)his is not an indication of a trend or change in direction comparable to the one supported by data in Roper”). The Court felt no need to see whether this trend developed further—perhaps because true moral evolution can lead in only one direction. And despite the argument that the rape of a young child may involve greater depravity than some murders, the Court proclaimed that homicide is categorically different from all (or maybe almost all) other offenses. See id., at 438 (stating that nonhomi-cide crimes, including child rape, “may be devastating in their harm . . . but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared to murder in their severity and irrevocability” (internal quotation marks omitted)). As the Court had previously put it, “death is different.” Ford, supra, at 411 (plurality opinion).
Two years after Kennedy, in Graham v. Florida, any pretense of heeding a legislative consensus was discarded. In Graham, federal law and the law of 37 States and the District of Columbia permitted a minor to be sentenced to life imprisonment without parole for nonhomicide crimes, but *513 despite this unmistakable evidence of a national consensus, the Court held that the practice violates the Eighth Amendment. See 560 U. S., at 97 (Thomas, J., dissenting). The Court, however, drew a distinction between minors who murder and minors who commit other heinous offenses, so at least in that sense the principle that death is different lived on.
Today, that principle is entirely put to rest, for here we are concerned with the imposition of a term of imprisonment on offenders who kill. The two (carefully selected) cases before us concern very young defendants, and despite the brutality and evident depravity exhibited by at least one of the petitioners, it is hard not to feel sympathy for a 14-year-old sentenced to life without the possibility of release. But no one should be confused by the particulars of the two cases before us. The category of murderers that the Court delicately calls “children” (murderers under the age of 18) consists overwhelmingly of young men who are fast approaching the legal age of adulthood. Evan Miller and Kuntrell Jackson are anomalies; much more typical are murderers like Christopher Simmons, who committed a brutal thrill-killing just seven months shy of his 18th birthday. Roper, supra, at 556.
Seventeen-year-olds commit a significant number of murders every year,[1] and some of these crimes are incredibly brutal. Many of these murderers are at least as mature as the average 18-year-old. See Thompson, supra, at 854 (O’Connor, J., concurring in judgment) (noting that maturity may “vary widely among different individuals of the same age”). Congress and the legislatures of 43 States have concluded that at least some of these murderers should be sentenced to prison without parole, and 28 States and the *514 Federal Government have decided that for some of these offenders life without parole should be mandatory. See ante, at 482-483, and nn. 9-10. The majority of this Court now overrules these legislative judgments.[2]
It is true that, at least for now, the Court apparently permits a trial judge to make an individualized decision that a particular minor convicted of murder should be sentenced to life without parole, but do not expect this possibility to last very long. The majority goes out of its way to express the view that the imposition of a sentence of life without parole on a “child” (i. e., a murderer under the age of 18) should be uncommon. Having held in Graham that a trial judge with discretionary sentencing authority may not impose a sentence of life without parole on a minor who has committed a nonhomicide offense, the Justices in the majority may soon extend that holding to minors who commit murder. We will see.
What today’s decision shows is that our Eighth Amendment cases are no longer tied to any objective indicia of society’s standards. Our Eighth Amendment case law is now entirely inward looking. After entirely disregarding objec *515 tive indicia of our society’s standards in Graham, the Court now extrapolates from Graham. Future cases may extrapolate from today’s holding, and this process may continue until the majority brings sentencing'practices into line with whatever the majority views as truly evolved standards of decency.
The Eighth Amendment imposes certain limits on the sentences that may be imposed in criminal cases, but for the most part it leaves questions of sentencing policy to be determined by Congress and the state legislatures—and with good reason. Determining the length of imprisonment that is appropriate for a particular offense and a particular offender inevitably involves a balancing of interests. If imprisonment does nothing else, it removes the criminal from the general population and prevents him from committing additional crimes in the outside world. When a legislature prescribes that a category of killers must be sentenced to life imprisonment, the legislature, which presumably reflects the views of the electorate, is taking the position that the risk that these offenders will kill again outweighs any countervailing consideration, including reduced culpability due to immaturity or the possibility of rehabilitation. When the majority of this Court countermands that democratic decision, what the majority is saying is that members of society must be exposed to the risk that these convicted murderers, if released from custody, will murder again.
Unless our cases change course, we will continue to march toward some vision of evolutionary culmination that the Court has not yet disclosed. The Constitution does not authorize us to take the country on this journey.

 Between 2002 and 2010, 17-year-olds committed an average combined total of 424 murders and nonnegligent homicides per year. See Dept, of Justice, Bureau of Justice Statistics, §4, Arrests, Age of persons arrested (Table 4.7).

 As the Court noted in Mistretta v. United States, 488 U. S. 361, 366 (1989), Congress passed the Sentencing Reform Act of 1984 to eliminate discretionary sentencing and parole because it concluded that these practices had led to gross abuses. The Senate Report for the 1984 bill rejected what it called the “outmoded rehabilitation model” for federal criminal sentencing. S. Rep. No. 98-225, p. 38 (1983). According to the Report, “almost everyone involved in the criminal justice system now doubts that rehabilitation can be induced reliably in a prison setting, and it is now quite certain that no one can really detect whether or when a prisoner is rehabilitated.” Ibid. The Report also “observed that the indeterminate-sentencing system had two ‘unjustifi[ed]’ and ‘shameful’ consequences. The first was the great variation among sentences imposed by the different judges upon similarly situated offenders. The second was uncertainty as to the time the offender would spend in prison. Each was a serious impediment to an evenhanded and effective operation of the criminal justice system.” Mistretta, supra, at 366 (quoting S. Rep. No. 98-225, at 38, 65 (citation omitted)).