**[J-60-2024] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 3 WAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered June 13, |
| | : | 2023, at No. 1008 WDA 2021, |
| v. | : | Affirming the Order of the Court of |
| | : | Common Pleas of Allegheny County |
| | : | entered December 19, 2016, at No. |
| DEREK LEE, | : | CP-02-CR-0016878-2014. |
| | : | |
| Appellant | : | ARGUED:  October 8, 2024 |

**CONCURRING OPINION**

**JUSTICE WECHT**                                        **DECIDED:  MARCH 26, 2026**

I join today's Opinion.  The Majority's scholarly analysis amply justifies the conclusion that the "cruel punishments" clause of the Pennsylvania Constitution provides broader protection than its later-adopted and textually distinct federal counterpart.[1]  The Majority compellingly demonstrates that the sentencing scheme for felony murder (*i.e.*, second-degree murder[2]) in this Commonwealth crosses the line into constitutional cruelty,

---

[1]      *See* PA. CONST. art. I, § 13 ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted."); U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel *and unusual* punishments inflicted.") (emphasis added).  The Eighth Amendment's Cruel and Unusual Punishments Clause is applicable to the states via the Fourteenth Amendment to the United States Constitution.  *See Robinson v. California*, 370 U.S. 660, 666-67 (1962).

[2]      18 Pa.C.S. § 2502(b) ("A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony."); *see also id.* § 2502(d) (defining "perpetration of a felony" as "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping").

in that it categorically mandates life imprisonment without the possibility of parole—the second-most severe penalty that the law can impose—without any allowance for consideration of individual culpability for the killing.

A departure from federal law necessarily means that we enter uncharted constitutional terrain. In this regard, a few points are worthy of emphasis.

## I.

As the Majority notes, "our decision should not be read as casting doubt upon the constitutionality of existing sentences for first degree murder, whether punished by life imprisonment or death."[3] It is important to underscore the narrow grounds for the operative distinction here, *i.e.*, the range of varying culpability for killing that falls within the felony-murder rule. This is best illustrated through contrast with the crime of first-degree murder. A conviction for first-degree murder necessitates proof beyond a reasonable doubt that the defendant acted with the specific intent to kill.[4] "It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder."[5] The personal culpability of the perpetrator of a first-degree murder cannot be doubted.[6]

---

[3] Maj. Op. at 70 n.18.

[4] 18 Pa.C.S. § 2502(a) ("A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."); *Commonwealth v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000) (citing *Commonwealth v. Hall*, 701 A.2d 190, 196 (Pa. 1997)) ("To sustain a conviction for first-degree murder, the Commonwealth must prove that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the accused did the killing and that the killing was done with deliberation.").

[5] *Simpson*, 754 A.2d at 1269.

[6] This is true even of a person convicted of first-degree murder under an accomplice liability theory, who may not have taken a life personally, but necessarily must have possessed the specific intent to kill. *See* 18 Pa.C.S. § 306(d) ("When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense."); *Commonwealth v. Huffman*, 638 A.2d 961, 962-64 (Pa. 1994) (finding reversible error (continued…)

By contrast, a person who participates in a qualifying felony, but who does "not kill or intend to kill," may be guilty of felony murder if someone dies during the crime, but "his culpability is plainly different" from the person who actually commits the act of intentional killing.[7]

This is the doctrinal basis for the constitutional line that Appellant Derek Lee draws around a "non-slayer" who, although convicted of second-degree murder, did not personally kill or intend to kill anyone. By way of example, consider that a person may be convicted of second-degree murder for, *e.g.*, serving as the getaway driver for a robbery, even if he did not intend (and had no reason to expect) that another robber would kill someone during the commission of the crime. Under the current sentencing scheme for second-degree murder, the getaway driver who intended only to make off with some ill-gotten gains must always be punished identically to a person who methodically plans and executes a cold-blooded murder. Despite their differing degrees of culpability for killing, both offenders spend the remainder of their natural lives in prison without ever having a chance of consideration for parole. It is this anomaly or discrepancy that serves as the cornerstone of the constitutional challenge in this case.

---

where jury instruction suggested that accomplice could be found guilty of first-degree murder absent proof of specific intent to kill) (*partially overruled on other grounds as recognized in Commonwealth v. Maisonet*, 31 A.3d 689, 694 n.2 (Pa. 2011)); *see also Commonwealth v. Koehler*, 36 A.3d 121, 154 (Pa. 2012) ("We clarified in *Huffman* that the Commonwealth must prove beyond a reasonable doubt that the defendant independently possessed the requisite specific intent to kill, and that the same could not be proven by evidence of the intent to kill possessed by the defendant's accomplice or co-conspirator.").

[7] *Enmund v. Florida*, 458 U.S. 782, 798 (1982); *see also id.* at 800 (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 698 (1975)) ("American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to 'the degree of [his] criminal culpability,' and the Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing.").

No one denies that one who commits a serious felony may deserve a lengthy prison sentence. But, as the Supreme Court of the United States long has recognized, "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers."[8] Where, however, a person *does* specifically intend to kill another, nothing in today's decision implicates the constitutionality of life imprisonment without the possibility of parole as a mandatory sentence for a resulting conviction of first-degree murder.[9]

First-degree murder is likewise the only offense eligible for the death penalty in Pennsylvania. Death is the most serious penalty that any government may impose. Because "the penalty of death is different in kind from any other punishment," the Supreme Court of the United States for many years has given the death penalty a unique treatment under the Eighth Amendment.[10] This distinction led to "two general classifications" in Eighth Amendment jurisprudence: cases involving "challenges to the length of term-of-years sentences given all of the circumstances of a particular case," and "cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty."[11] In recent years, however, the United States Supreme Court has extended the "categorical" approach previously reserved for capital cases to

---

[8] *Graham v. Florida*, 560 U.S. 48, 69 (2010) (citing *Enmund*, 458 U.S. 782; *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Tison v. Arizona*, 481 U.S. 137 (1987); *Coker v. Georgia*, 433 U.S. 584 (1977)).

[9] *See* Maj. Op. at 65 ("While it may be entirely appropriate to mandate a sentence of life imprisonment without parole for individuals convicted of first degree murder, the question before us is whether the same mandate for *all* individuals convicted of second degree murder constitutes cruel punishment.") (emphasis in original).

[10] *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality).

[11] *Graham*, 560 U.S. at 59.

challenges of life-without-parole sentences, specifically for juvenile offenders.[12]  This jurisprudential innovation was premised in large part upon the idea that the severity of life-without-parole renders the sentence similar to the death penalty in some respects.[13] Given these federal developments, it is understandable that Lee seeks a further extension of the Supreme Court of the United States' "categorical" approach beyond the capital context, *a la Graham* and *Miller*.

As the Majority rightly concludes, however, we need not take that step here as a matter of federal law.[14]  And we do not do so.  The Majority provides more than adequate grounds to distinguish between the Eighth Amendment and Article I, Section 13 for purposes of an *Edmunds* analysis, and thus to correct this Court's previous decision to read our own Constitution in lockstep with federal law.[15, 16]

---

[12]    *See Graham*, 560 U.S. 48 (holding that sentence of life-without-parole is unconstitutional for juvenile offenders in non-homicide cases); *Miller v. Alabama*, 567 U.S. 460 (2012) (holding that mandatory sentence of life-without-parole is unconstitutional for juvenile offenders).

[13]    *See Graham*, 560 U.S. at 69 (reasoning that "life without parole sentences share some characteristics with death sentences that are shared by no other sentences"); *see also id.* at 103 (Thomas, J., dissenting) ("'Death is different' no longer.").

[14]    *See* Maj. Op. at 27-28.

[15]    *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 967 (Pa. 1982) (holding that the "rights secured by the Pennsylvania prohibition against 'cruel punishments' are co-extensive with those secured by the Eighth and Fourteenth Amendments"); *see* Maj Op. at 54 (critiquing *Zettlemoyer*'s "incomplete account of the Commonwealth's constitutional past").

[16]    I am increasingly skeptical of decisions, like *Zettlemoyer*, that tether the meaning of the Pennsylvania Constitution to the interpretation of the United States Constitution, particularly with regard to provisions, such as Article I, Section 13, that predate their federal analogues.  When we decide that our own Constitution is "co-extensive" with federal law, we make a bold commitment.  We necessarily adopt even future decisions of the Supreme Court of the United States, sight-unseen, no matter how poorly reasoned, and notwithstanding that they concern a different document with a distinct text and history.  And, given the *stare decisis* effect of our decisions, when we hitch our jurisprudential wagon to the decisions of another, we unjustly bind our successors.  Thus, we find (continued…)

## II.

For purposes of Article I, Section 13 of the Pennsylvania Constitution, nothing in the Majority's discussion implicates the constitutionality of the death penalty as a sentence for first-degree murder.[17]  As the Majority reasons, *mandatory* sentences of life-without-parole for all convictions of second-degree murder, "regardless of culpability," fail to allow an "individualized assessment either at sentencing or through parole," and, by making culpability irrelevant to the imposition of one of the harshest sentences, the sentencing scheme "poses too great a risk of disproportionate punishment," and is thus "cruel."[18]  As noted above, the death penalty in this Commonwealth is reserved for the most egregious first-degree murder cases, where the culpability of the offender is at its zenith.  Moreover, capital punishment is anything but mandatory.  Rather, the penalty is governed by a statutory scheme that requires careful, circumstance-specific consideration of aggravating and mitigating circumstances, which are designed to take particular account of the defendant's individual culpability and characteristics, and to reduce the possibility of arbitrary death sentences.[19]  With its focus upon the varying culpability of offenders in cases of second-degree murder, the Majority suggests nothing

---

ourselves now, nearly a half-century after *Zettlemoyer*, correcting a mistake that this Court should not have made in the first place.  The Pennsylvania Constitution is a rich document with its own unique legacy—an ancestor of the United States Constitution rather than a descendant—which protects a bundle of fundamental rights wholly independent of any federal document.  That should be the starting point for analysis of any provision of the Pennsylvania Constitution.  *See Edmunds*, 586 A.2d at 894-95 ("Here in Pennsylvania, we have stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated.").

[17]     *See* Maj. Op. at 70 n.18.

[18]     *Id.* at 65, 69.

[19]     *See* 42 Pa.C.S. § 9711.

that implicates this established procedure. If there is a viable challenge to the death penalty under the Pennsylvania Constitution, it is beyond the scope of the instant case.

The issue here is solely the constitutionality of the mandatory sentence of life-without-parole for all persons convicted of second-degree murder. This also defeats the suggestion of the Commonwealth and its *amicus curiae* that the constitutional analysis here is actually a surreptitious attack on the doctrinal foundation of the felony murder rule.[20] The Commonwealth's claim in this regard is a strawman. A constitutional challenge to the severity of a sentence has nothing to do with the validity of the substantive offense. As a substantive offense, the felony murder rule has deep roots in the common law, premised upon a theory of imputed malice pursuant to which "the malice necessary to make a killing, even an accidental one, murder, is constructively inferred from the malice incident to the perpetration of the initial felony."[21] There is nothing constitutionally infirm in the theory of imputed malice that underlies the crime of second-degree murder. This is a choice that the General Assembly was and is entitled to make pursuant to its prerogative to codify common law crimes and to define by statute Pennsylvania's criminal offenses and the elements thereof. There is no question that the legislature similarly is entitled to prescribe the penalty for the crime that it has defined as

---

[20] *See* Commonwealth's Br. at 13 (suggesting that Lee's "argument is really a challenge to the felony murder rule which rests culpability on each participant in the underlying felony equally"; "What [Lee] is really doing is trying to escape the consequences attendant to being an accomplice."); *Amicus Curiae* Br. of Pennsylvania District Attorneys Association at 7 ("One must then wonder if [Lee's] real challenge is not to his sentence, but to the doctrine of vicarious criminal liability, without which he could not have been convicted of second-degree murder.").

[21] *Commonwealth ex rel. Smith v. Myers*, 261 A.2d 550, 553 (Pa. 1970); *see also Commonwealth v. Yuknavich*, 295 A.2d 290, 292 (Pa. 1972) (quoting *Myers*, 261 A.2d at 553); *Commonwealth v. Tarver*, 426 A.2d 569, 573 (Pa. 1981) (same).

second-degree murder.  The severity of that penalty, however, is necessarily subject to the constitutional prohibition of "cruel" punishments.[22]

### III.

The legislative prerogative to define crimes and punishments further informs another feature worthy of note in the Majority's analysis:  its discussion of the penological justifications for criminal punishment.  Appropriately, the Majority acknowledges "retribution" as one theory of punishment among several that operate in Pennsylvania law.  The legislature is not constitutionally prohibited from considering an interest in retribution when drafting the Crimes Code or the Sentencing Code.  As the *Graham* Court remarked, "[c]riminal punishment can have different goals, and choosing among them is within a legislature's discretion."[23]  With this in mind, it is fit and proper that the Majority rebuffs the invitation of Lee and his *amici* to overhaul the foundation of criminal sentencing in this Commonwealth.

In any discussion of penal philosophy, it is helpful to define some terms.  The precise framing and terminology may vary, but there traditionally have been four "goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation."[24]  "Deterrence" concerns the disincentive to commit similar crimes in the future, both on the part of the offender and others who may learn

---

[22]    PA. CONST. art. I, § 13.

[23]    *Graham*, 560 U.S. at 71 (citing *Harmelin v. Michigan*, 501 U.S. 957, 999 (1991) (Kennedy, J., concurring)).

[24]    *Id.* (citing *Ewing v. California*, 538 U.S. 11, 25 (2003) (plurality)); *see also Commonwealth v. Coleman*, 285 A.3d 599, 613 (Pa. 2022) (quoting *Commonwealth v. Williams*, 652 A.2d 283, 285 n.1 (Pa. 1994)) ("[S]entencing serves many purposes, including 'protection of society, general deterrence (example to others), individual deterrence, rehabilitation, and retribution (punishment, vengeance, des[]erts).'"); *Amicus Curiae* Br. of Criminologists and Law Professors at 5-6 (collecting scholarship) ("Criminologists widely recognize—and analyze—four purposes of sentencing: retribution, rehabilitation, deterrence, and incapacitation.").

from the offender's example; "incapacitation" refers to the need to protect society from offenders likely to pose a threat if not incarcerated; and "rehabilitation" focuses upon the ability of the criminal justice system to reform the offender, so that he might avoid future criminality.[25] "Retribution"—often defined as "the interest in seeing that the offender gets his 'just deserts'"[26]—is a goal that "reflects society's and the victim's interests in seeing that the offender is repaid for the hurt he caused."[27] Retribution is perhaps the most natural and intuitive reason to punish crime, an impulse and justification familiar now as in the past.[28] Writ large on the canvas of American law, it is impossible to discern a world in which criminal sentencing is purged of a retributive element. Before law, no doubt, there was retribution. And every system of law that has evolved since the dawn of time has carried that retributive impulse forward. To pretend or posture otherwise, as some commentators of past and present do, is fantasy and delusion.

Wisely, the Majority does not accept the invitation of Lee and his *amici* to declare that "retribution" is a categorically impermissible aspect of criminal punishment in this Commonwealth going forward, and no portion of the Majority's discussion may fairly be read to suggest as much.[29] The bulk of the Majority's discussion of penal philosophy lies

---

[25]     *See generally* 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 1.5(a) (Theories of punishment) (3d ed. 2017).

[26]     *Atkins v. Virginia*, 536 U.S. 304, 319 (2002).

[27]     *Kennedy*, 554 U.S. at 442 (citing *Atkins*, 536 U.S. at 319; *Furman v. Georgia*, 408 U.S. 238, 308 (1972) (Stewart, J., concurring)).

[28]     *See Furman*, 408 U.S. at 308 (Stewart, J., concurring) ("The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.").

[29]     *See, e.g.*, Maj. Op. 67-68.

within its *Edmunds* analysis,[30] in which the Majority discusses the history of the "cruel punishments" provision of Article I, Section 13 of the Pennsylvania Constitution—an account that recent scholarship has suggested as support for a departure from federal interpretation of the Eighth Amendment.[31]  The conclusion to be drawn from this history is that some framers of Pennsylvania's Constitution appeared to regard rehabilitation and deterrence to be the only legitimate reasons to punish a criminal, and that any penalty that exceeded what was necessary to achieve those aims was "cruel" in the constitutional sense.[32]

Such discussion of history is all well and good.  As a practical matter, however, it is less than clear how a rejection of retribution as a penological aim would function in practice, even if it was possible in theory.  This is likewise true of incapacitation—another traditional justification for punishment; it too would seem to be excluded by reference to some framers' exclusive focus upon deterrence and rehabilitation.

The justifications for punishment are a philosophical explanation for *why* we, as a society, punish crime.  They are far more descriptive than prescriptive.  By and large, criminal sentencing serves *all* of the aims of punishment.  These concepts can provide a framework for explaining why a particularly severe penalty—death or life-without-parole— is grossly disproportionate to a given offense or class of offender, as the Supreme Court

---

[30]  *See Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991) (articulating factors bearing upon the analysis of provisions of the Pennsylvania Constitution, including "1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; [and] 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence").

[31]  *See* Maj. Op. at 46-49 (discussing Kevin Bendesky, *"The Key-Stone to the Arch": Unlocking Section 13's Original Meaning*, 26 U. PA. J. CONST. L. 201 (2023) ("Bendesky")).

[32]  *Id.* at 48-49 & n.15.

of the United States has done in its "categorical restriction" line of cases,[33] and as the Majority does today.[34] This rationale is of some utility in articulating, for instance, that sentencing a juvenile to life-without-parole fails to serve an interest in rehabilitating that juvenile.[35] However, the vast majority of scenarios fall into a far grayer area, where a focus upon discrete penological justifications is not a helpful yardstick for measuring the suitability of a particular sentence in a particular case.

I know of no standard by which we might declare with respect to a given offender or a given crime that a five-to-ten year prison sentence is necessary to serve the interests in deterrence and rehabilitation (and *only* those interests), but that a sentence of six-to-twelve years would exceed those interests and thus cross the constitutional line into "cruelty." One can foresee all manner of novel constitutional challenges to quite ordinary sentences, premised upon the notion that they exceed what is necessary for rehabilitation or deterrence, are impermissibly concerned with retribution, etc. We are not equipped to pick apart such sentences in search of the nebulous boundaries between penological justifications. Nothing in today's decision can be read to undermine the constitutionality of such sentences.

Today's decision presages the development of a new body of jurisprudence based upon the independent protections of Article I, Section 13 of the Pennsylvania Constitution, cut free from federal precedent. I fully support this endeavor. This is an endeavor that maintains our proper role and that remains respectful of legislative prerogatives. The

---

[33] *See, e.g., Graham*, 560 U.S. at 71-74; *Kennedy*, 554 U.S. at 441-46; *Atkins*, 536 U.S. at 318-20; *Roper v. Simmons*, 543 U.S. 551, 571-72 (2005).

[34] *See* Maj. Op. at 65-68 (reasoning that mandatory sentence of life-without-parole for all convictions of second-degree murder fails to serve interests in rehabilitation, deterrence, retribution, and incapacitation).

[35] *See Graham*, 560 U.S. at 74.

General Assembly has articulated statutory standards for sentencing that mandate consideration of "the gravity of the offense as it relates to the impact on the life of the victim and on the community"[36]—a factor steeped in the interest of retribution. And Pennsylvania's sentencing guidelines expressly declare that they establish a "system with a primary focus on retribution."[37] The Majority's Opinion does not call the foundation of this system into doubt, nor otherwise suggest that our General Assembly's entire approach to criminal sentencing is in constitutional jeopardy.

The Majority's discussion of penological interests is best understood as an historical inquiry into the foundational distinctions between Article I, Section 13 and the federal Eighth Amendment. The Majority's *Edmunds* analysis underscores the need to give independent meaning to our own constitutional provision. Today's decision offers no indication that Article I, Section 13 prohibits consideration of "retribution" in a criminal sentence or sentencing statute. Nor is it an invitation to appellate jurists to invalidate any sentence that might strike them as beyond what is strictly "necessary" to serve some legitimate interest.

## IV.

A final matter requires comment. The arguments of Lee and his *amici curiae* in this case rely to some extent upon reference to international law and the practices of various foreign nations. The Majority wisely does not engage with this suggestion. While the Majority's silence on the matter is suggestive, I would go a step further. I would

---

[36]  42 Pa.C.S. § 9721(b).

[37]  204 Pa. Code § 303a.5(b)(2) ("Purposes of sentencing") ("The sentencing guidelines provide a system with a primary focus on retribution, but one which allows for the fulfillment of other utilitarian sentencing purposes, including person rehabilitation, general deterrence, incapacitation to protect the public, and victim restoration.").

expressly declare that foreign law, norms, and practice are irrelevant to the interpretation and application of the Pennsylvania Constitution.

In numerous cases concerning the Eighth Amendment, the Supreme Court of the United States has utilized international and foreign law as a component of its rationale for concluding that a punishment is "cruel and unusual."[38]  This practice has engendered significant (and, in my view, well-warranted) criticism from jurists and scholars.[39]  As a historical matter, the laws of Pennsylvania and the United States were designed expressly to differ in many respects from those of other nations.[40]  As our law was intended to be distinct at its inception, it makes little sense to attempt a harmonization with foreign norms today.  Just as importantly, every legal principle articulated in another country rests upon the backdrop of the culture, legal traditions, and mores of that nation and people, a backdrop that is often quite different from our own.[41]  It is likely impossible, and probably hubristic, for American jurists to take adequate account of these variations among nations and cultures.  Reliance upon the legal rules of other countries creates a substantial risk

---

[38]  *See, e.g.*, *Graham*, 560 U.S. at 80-82; *Roper*, 543 U.S. at 575-78; *Atkins*, 536 U.S. at 316 n.21; *Enmund*, 458 U.S. at 796 n.22; *Coker*, 433 U.S. at 596 n.10.

[39]  *See, e.g.*, John O. McGinnis, *Foreign to Our Constitution*, 100 Nw. U. L. Rev. 303 (2006); Ken I. Kersch, *The New Legal Transnationalism, the Globalized Judiciary, and the Rule of Law*, 4 Wash. U. Glob. Stud. L. Rev. 345 (2005); Michael Wells, *International Norms in Constitutional Law*, 32 Ga. J. Int'l & Compar. L. 429 (2004).

[40]  *See* Maj. Op. at 46 (quoting Bendesky at 213) (referring to comment of Justice William Bradford that the severity of English law was "an exotic plant and not a native growth of Pennsylvania").

[41]  *See Roper*, 543 U.S. at 626-27 (Scalia, J., dissenting) ("It is beyond comprehension why we should look . . . to a country that has developed, in the centuries since the Revolutionary War—and with increasing speed since the United Kingdom's recent submission to the jurisprudence of European courts dominated by continental jurists—a legal, political, and social culture quite different from our own."); Wells, *supra* n.38, at 436 ("[I]t seems at best pointless, and at worst destructive, to give weight to decisions reached by international tribunals that, by their very nature, cannot give due regard to differences among cultures.").

that important context is lost in translation.  Even setting aside the practical challenges of making coherent use of these materials, a more fundamental objection remains:  we are Pennsylvanians, and we are interpreting the Pennsylvania Constitution.  The very suggestion that Pennsylvania law "should conform to the laws of the rest of the world . . . ought to be rejected out of hand."[42]

Even proponents of the use of international law in American constitutional interpretation must grapple with another obvious criticism of the practice: cherry-picking.  If the laws of all the nations of the world are fair game, then one should consider *all* of their merits.  This is nearly impossible to do.  One tends to emphasize the materials that support a preferred view while downplaying or wholly disregarding those that weigh against it.  Justices Antonin Scalia and Stephen Breyer agreed that the enterprise was akin to Judge Harold Leventhal's legendary comment on the use of legislative history as "looking out over the crowd at a cocktail party to try to identify your friends."[43]  As Justice Scalia elsewhere put it:  "To invoke alien law when it agrees with one's own thinking, and ignore it otherwise, is not reasoned decisionmaking, but sophistry."[44]  Judge Richard Posner once articulated the criticism in the following terms:

> The citation of foreign decisions is opportunistic; in fact, it is a "rhetorical" move in the pejorative sense of the word.  Our Justices cite foreign decisions for the same reason that they prefer to quote from a previous

---

[42]    *Roper*, 543 U.S. at 624 (Scalia, J., dissenting).

[43]    Norman Dorsen, *The relevance of foreign legal materials in U.S. constitutional cases: A conversation between Justice Antonin Scalia and Justice Stephen Breyer*, 3 INT'L J. CONST. L. 519, 530 (2005) (Justice Breyer:  "Foreign decisions in this respect are a little like legislative history.  And criticism of their uses is the same."  Justice Scalia:  "It sure is."); *see also Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").

[44]    *Roper*, 543 U.S. at 627 (Scalia, J., dissenting).

decision rather than state a position anew: they are timid about speaking in their own voices lest the mask slip and legal justice be revealed as personal or political justice.[45]

Litigation in the Supreme Court of Pennsylvania is not litigation in the International Court of Justice. Foreign laws, practices, or customs have no place in the analysis of the Pennsylvania Constitution. Fortunately, the Majority does not suggest to the contrary. Future litigants should take note.

---

[45] Richard A. Posner, *Foreword: A Political Court*, 119 Harv. L. Rev. 31, 88 (2005).